**TENNECO, INC., Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**No. 28097.**

United States Court of Appeals,
Fifth Circuit.

Nov. 13, 1970.

Anthony J. P. Farris, U. S. Atty. James R. Gough, Asst. U. S. Atty., Houston, Tex., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., John O. Jones, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., George R. Pain, Asst. U. S. Atty., Houston, Tex., Robert I. Waxman, Atty., Tax Div., Dept. of Justice, Washington, D. C., Fred B. Ugast, Acting Asst. Atty. Gen., William A. Friedlander, Atty., Department of Justice, Washington, D. C., for appellant.

Robert K. Jewett, William C. Griffith, Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel for appellee.

Before GEWIN, GOLDBERG and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This appeal presents the question of whether costs incurred by the taxpayer (Tenneco), a transporter of natural gas by pipeline, in obtaining right-of-way easements for the construction of pipelines, qualify for accelerated depreciation under Section 167(b) of the Internal Revenue Code of 1954.[1] The district court held that such costs did so qualify for acceleration of depreciation, and the government appeals that ruling. Although we reach the view that the taxpayer has made a case against Section 167 which might merit Congressional review, we conclude that under the law as now written the easement costs in issue do not qualify for accelerated depreciation. Accordingly we reverse and remand.

At issue are claimed refunds of federal income taxes paid in the amounts of $292,508 and $317,932, for the years 1959, and 1960, plus interest. The taxpayer is engaged in the business of purchasing, transporting via pipeline, and selling natural gas both to utility companies for resale and directly to industrial users. The pipelines owned by Tenneco were constructed for it by independent

---

[1]. All statutory references herein are to the Internal Revenue Code of 1954.

contractors across property owned by others, under right-of-way agreements obtained from the landowners.

For depreciation purposes Tenneco has maintained a single composite account for its transmission system. All of the amounts paid to the pipeline contractors and property owners are included in this composite account. These costs include: payments for rights-of-way, other acquisition costs, damages, surveying costs, and clearing and grading expense. For rate-making purposes, Tenneco depreciates its transmission costs on a straight line method over a life of 32½ years. For federal income tax purposes, Tenneco uses accelerated depreciation and a life of 28½ years.

We discuss briefly the nature of the costs which are at issue here:

(a) Initial Easement Costs—In order to build the pipeline, the taxpayer must first obtain the right to lay the line over and through the land of others. Sometimes this is done by voluntary contractual easement while at other times it is necessary that Tenneco exercise its power of condemnation. For these easements Tenneco customarily pays a specified sum for each rod of land used (a roddage fee) and an additional amount to compensate the landowner for damages resulting from granting the easement. The amounts of these fees depend on the nature and value of the land crossed by the pipeline.

(b) Other Acquisition Costs—These costs include salaries and travel expenses of employees and land agents, legal fees paid for title work and condemnation suits, abstracts and recording fees, and other miscellaneous expenses.

(c) Damages—These damages usually occur at the time the pipeline is laid, and include compensation for injuries to growing crops, temporary disruption of the fertility of the land, and the destruc-tion of timber. The obligation to pay such damages is usually spelled out in the easement agreement, and the payment for damages is normally tendered after the actual injury is incurred by the landowner. In some cases, however, landowners require that damages be estimated and paid in advance. Often damages are again incurred to be paid when the taxpayer finds it necessary to repair or replace a damaged line. Tenneco also incurred expense in this category for legal fees and salaries and expenses of employees in the settlement of damage claims.

(d) Preliminary Survey Costs—These are the costs necessarily expended to ascertain the dimensions and location of the needed easements.

As noted earlier, Tenneco placed all of the above-described costs in one composite pipeline account, and depreciated the account for income tax purposes over the accelerated period of 28½ years. The Commissioner of Internal Revenue contested the acceleration of depreciation on these costs, maintaining that they represented the cost basis of intangible assets (the easements) and as such were subject to straight line depreciation. The Commissioner assessed the claimed deficiency which the taxpayer paid. Claims for refund were filed followed by the action in the lower court seeking refund. The district court held for the taxpayer, ruling that the costs were to be added to the composite account for pipeline construction and were eligible for accelerated depreciation.[2]

To restate the problem, the taxpayer has treated the easements and the costs attributable thereto not as a separate intangible asset, but rather merely as a part of the cost of a greater tangible asset, that is, the gas transmission system. Accordingly, all of the costs attributable to the acquisition of the ease-

2. Also at issue below was the proper treatment of depreciation taken for the initial clearing and grading costs. The district court also found that these costs were properly attributable to the composite account and subject to accelerated deprecia-tion. The government apparently concedes that the district court was correct in this respect, and does not renew on appeal its objection to the accelerated depreciation of these costs.

ments have been consolidated into the composite account, added to the adjusted basis of the gas transmission system, and accelerated depreciation has been taken on the entire account. The question is whether such practice comports with the law as established by Section 167.[3]

Counsel for the taxpayer first argues with skill and considerable force that the decided cases dictate a result favorable to the taxpayer. At this juncture we note that the accelerated depreciation provisions of Section 167 were first introduced into the Revenue Code in 1954. For this reason we do not find relevant the cases cited by taxpayer which were decided prior to the enactment of the provisions in question. Respecting post-1954 cases, we are cited to United States v. Regan, 9 Cir. 1969, 410 F.2d 744; Connecticut Light and Power Co. v. United States, 1966, 368 F.2d 233, 177 Ct.Cl. 395, and Willow Terrace Development Company v. Commissioner of Internal Revenue, 5 Cir. 1965, 345 F.2d 933. These cases are far from persuasive upon the question of whether the costs in question qualify for accelerated depreciation. *Willow Terrace,* supra, written by Judge Bell for this Court, involved the question of whether the costs of a water and sewerage system were properly allocated to the costs of constructed homes for the purpose of computing the basis which a real estate developer held in the homes. Whether the costs of the system were allocable to the homes for the purpose of taking accelerated depreciation was not an issue. *Connecticut Light and Power,* supra, concerned the question of whether damages incurred in acquiring flowage rights should be treated by a hydroelectric plant as an expense or as a capital expenditure allocable to the utility's composite account for depreciation. This case did involve the allocation of the costs to a composite account, and the taking of accelerated depreciation on the

account. But *Connecticut Light and Power* has been closely limited to its facts by a subsequent decision of the Court of Claims. Panhandle Eastern Pipeline Company v. United States, Ct. Cl. 1969, 408 F.2d 690, at page 698, fn. 5. *Regan,* supra, centered on the issue of whether the expenses incurred in building an access road to timber lands were capital expenditures. We do not find *Regan* to have involved the issue of accelerated depreciation.

The taxpayer further argues that unlike some intangible assets the easements here in question have no value separate and apart from the pipeline, and therefore economic realities and generally accepted principles of accounting command inclusion of the easements and their costs as capital expenditures in the construction of the pipeline. At trial the taxpayer introduced testimony of a certified public accountant to the effect that accounting principles dictate that all costs, tangible as well as intangible, which are incurred in order to construct a physical asset are treated as the cost of that asset if such cost must be reincurred with each reconstruction of such asset or if such costs have no measurable values separate and apart from such physical asset and if the reconstruction of such asset is speculative. The government counters Tenneco's argument by noting that Congress acknowledged that the taking of accelerated depreciation on some assets would require the maintenance of separate accounting records for income tax purposes only. Senate Finance Committee Report, S.Rep. No. 1622, 83rd Cong. 2 Sess., p. 204, 3 U.S.C.Cong. and Adm. News, pp. 4621, 4839 (1954).

We are not persuaded that we should or can ignore the plain, unambiguous language of the statute in favor of accounting principles which, while salutary in nature, lack the effect of law.

3. Section 167 establishes the rules for the allowance of depreciation deductions. Section 167(b) provides that under certain circumstances accelerated deprecia-

tion may be taken, but that provision is qualified by 167(c) which limits accelerated depreciation to property other than intangible property.

Conceding putative merit to the proposition that based upon economic realities the easements in question should be depreciated at an accelerated rate, we suggest that this argument addresses itself to the Congress rather than the courts. The legislative history indicates that while Congress may not have considered the exact situation at hand, it did consider a closely-analogous intangible interest, that of a lease, in legislating a blanket prohibition against accelerated depreciation for intangibles.[4] The Senate Finance Committee included the following statement in its report (S.Rep. No. 1622, 83rd Cong. 2d Sess. p. 202, 3 U.S.C.Cong. and Adm.News (1954) pp. 4621, 4837):

> Your committee has completely rewritten subsection (c). Subsection (c) defines the property with respect to which subsection (b) applies. Subsection (b) does not apply to intangible property such as patents, copyrights, and leases, etc. Your committee has eliminated the word "personal" as leases are meant to be excluded for allowances provided for by methods allowed in subsection (b).

This legislative comment leads us to the conclusion that Congress gave adequate consideration to the many different characteristics of intangible assets in the process of enacting Section 167, and that we would not be justified in this situation in applying a judicial gloss which would require or permit a distinction between intangible assets on the basis of their relation to tangible assets.

Moreover, the one case cited to us or revealed by our research which directly met the precise issue now before us resulted in a determination adverse to the position urged by the taxpayer, Panhandle Eastern Pipeline Company v. United States, supra, holding squarely that a right-of-way, easement is in many respects similar to a lease and "is included in the kind of property which Congress intended to classify as an intangible for the purposes of Sections 167(b) and 167(c)". Ibid: 408 F.2d at 699. We think *Panhandle* is soundly reasoned to a correct conclusion.

■ Our determination that the district court erred in allowing easement costs to be consolidated into the composite account with pipeline costs requires that we further decide whether damage costs incurred at the time of construction and repairs of the pipelines and preliminary surveying costs are properly allocable to the easement account or to the pipeline account.

We first consider the damage costs. Tenneco here differentiates between amounts of damages paid for the permanent diminution in value of the land as a result of the existence of the easements and the amounts paid for the temporary injury to the land caused solely by the construction and repair of the pipeline.

---

4. The taxpayer attempts to distinguish the analogy to the leasehold interest explicitly discussed by Congress on the grounds that a lease interest always has value separate and apart from any assets constructed thereon, while the easement in question is alleged by taxpayer not to have any value separate and apart from the pipeline. Taxpayer's assertion is not necessarily correct. We believe that a lease agreement could be drafted to facilitate the construction of one particular building, and in that situation it seems clear that Section 167 would prohibit accelerated depreciation for the leasehold interest.

The taxpayer also calls to our attention Treasury Regulation 1.167(a)–4, which provides that where the useful life of a building is limited by the leasehold interest upon which the building rests, the tangible building must be depreciated on the straight line method over the life of the intangible lease. Taxpayer asserts that if tangible assets must be combined with intangible assets when the intangible asset determines the useful life of the tangible asset, then the converse is equally true. What Tenneco neglects to consider is that historically this provision has been viewed as a *deduction in lieu of an allowance for depreciation.* See Article 109, Treasury Regulation 45, Revenue Act of 1918; Treasury Regulation 118, Section 39.23(a)–10 (1939 Code). The present regulation states that "Such deduction shall be taken in lieu of allowances for depreciation".

Under our ruling that easement costs are not allocable to pipeline costs the taxpayer apparently concedes that the payments for permanent injury to the land from the granting of the easement are allocable to the easement account; it urges however that the temporary damages from actual construction and repair of the pipeline are properly pipeline costs. Tenneco urges also that .it has been the practice of the government in the past not to challenge the allocation of damages arising from construction activity to pipeline costs. See Southern Natural Gas Company v. United States, Ct.Cl.1969, 412 F.2d 1222, 1228, fn. 5. Taxpayer apparently contends that this is a tacit government admission that the taxpayer's position is correct.

The government points to Commonwealth Natural Gas Corporation v. United States, E.D.Va.1966, 266 F.Supp. 298, and the holding of that case that construction damages are in reality deferred payments on the purchase of the easements. The government argues that the taxpayer's position is illogical because both the permanent and temporary damages result from the same contractual provisions and both compensate the landowner for anticipated damages.

█ We are not impressed with Tenneco's argument that the past practice of the government as to earlier cases involving other taxpayers is somehow an admission of the incorrectness of the appellant's present position. The failure of the government earlier to challenge the allocation of damage costs in no way diminishes the force of its arguments here directed to that issue.[5]

We conclude that the damage amounts are properly attributable to the cost of the easements. The district court indeed found that these costs were "in essence additional amounts paid by Tenneco to acquire the easements". We note that the obligation to pay such amounts is incurred in the easement contract, even though the actual payment is generally triggered by the construction and repair of the pipeline. The construction of the pipeline and the damages incurred result from utilization of the easement for which taxpayer contracted. We think that the key lies in the fact that the damage amounts *are paid to the landowner for utilization of the contractual easement*. They are primarily easement costs, and only secondarily costs of the construction of the pipeline.

The only survey costs at issue here are those incurred *preliminarily* to the acquisition of the easements and construction of the pipelines. The record contains testimony to the effect that the preliminary surveys are a necessary step in both the purchase of easements and the early estimation and purchase of materials for the construction of the pipeline. It may be that apportionment of the preliminary survey costs is in order. Because the district court concluded that all costs should be placed in the pipeline account, it was not necessary for it to make findings on this point. Our disposition of the primary issue renders further findings now appropriate.

Our holding then is as follows: (1) the district court erred in ruling that the costs of the easements were properly allocated to the pipeline composite account; (2) the district court was correct in ruling that the damage costs incurred in construction and repair of the pipeline are attributable to the cost of the easement.[6] Because of our ruling in

5. This holding in no way impinges upon the doctrine of "consistency in tax accounting" declared for us by Judge Sibley in Joseph Eichelberger & Co. v. C.I.R., 5 Cir. 1937, 88 F.2d 874, for the reason that the earlier cases here relied on involved entirely separate taxpayers. Cf. Simmons v. United States, 5 Cir. 1962, 308 F.2d 938.

6. The theory behind accelerated depreciation is its propulsive effect upon our gross national product. Congress was interested in encouraging, through the reward of accelerated depreciation, expenditures integral to building and production; hence it excepted costs of acquiring leaseholds (easements) from its beneficence. Those expenses which were directed to-

(1) above these costs may not be allocated to the pipeline composite account. As to these matters we reverse with directions that the district court enter judgment in favor of the United States. We further hold (3) that with regard to the preliminary survey costs the cause is remanded to the district court for its determination on this or a supplemented record whether the preliminary survey costs are properly attributable to the easement account or to the pipeline account, or whether apportionment of such costs is proper. If the facts as found indicate that these costs should be apportioned, the district court must adopt an appropriate standard for apportionment and determine the amounts to be apportioned to each account.

Reversed and remanded with directions.

ward building the pipeline are within the grace of accelerated depreciation, but those expenses which were related to the

acquisition of property for the building of the line are excluded from its shelter.