**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WASHINGTON MUTUAL INC., as
successor in interest to H.F.
Ahmanson & Co. and
Subsidiaries,

       *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,

       *Defendant-Appellee.*

No. 09-36109

D.C. No.
2:06-cv-01550-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
November 1, 2010—Seattle, Washington

Filed March 3, 2011

Before: Betty B. Fletcher, Ferdinand F. Fernandez, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge B. Fletcher;
Concurrence by Judge Fernandez

3055

## COUNSEL

Alan I. Horowitz, Steven R. Dixon, and Maria O'Toole Jones, Miller & Chevalier, Chartered, Washington, D.C., Thomas D.

Johnston, Shearman & Sterling, Washington, D.C., for the plaintiff-appellant.

Arthur Thomas Catterall, Henry C. Darmstadter, David N. Geier, Teresa E. McLaughlin, and James E. Weaver, U.S. Department of Justice, Washington, D.C., Helen J. Brunner, Office of the U.S. Attorney, Seattle, Washington, for the defendant-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

This is yet another case arising in the aftermath of the Government's efforts to contain the savings and loan crisis of the late 1970's and the early 1980's. In 1981, Home Savings of America, FSB ("Home Savings"), agreed to acquire three failing savings and loan associations, or thrifts. In exchange, the Federal Savings and Loan Insurance Corporation gave Home Savings a generous package of incentives that included, among other items, the right to maintain branches in other states (the "branching rights") and the right to use the purchase method of accounting for regulatory capital reserve purposes (the "RAP rights") (together, "the Rights.").

Washington Mutual, Inc. ("Washington Mutual"), as successor in interest to Home Savings and its parent company, H.F. Ahmanson & Co. ("Ahmanson"), filed amended tax returns with the Internal Revenue Service (IRS), seeking refunds for 1990, 1992, and 1993 based on the amortization of the RAP rights and the abandonment of the branching rights. After the IRS denied the claims, Washington Mutual sued in district court. The district court ruled on summary judgment that Home Savings did not have a cost basis or a fair market value basis in the RAP rights and the branching rights and rejected Washington Mutual's amortization and loss deduction-related refund requests.

Washington Mutual appeals. We hold that Home Savings had a cost basis in the RAP rights and the branching rights equal to some part of the excess of the three acquired thrifts' liabilities over the value of their assets. In light of our ruling, we do not address Washington Mutual's alternative theory, that Home Savings had a fair market value basis in the Rights pursuant to 26 U.S.C. § 597 (Supp. V 1981) and 12 U.S.C. § 1729(f) (Supp. V 1981). Accordingly, we reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   The Savings and Loan Crisis

The savings and loan crisis of the late 1970's and early 1980's has been chronicled in detail in *United States v. Winstar Corp.*, 518 U.S. 839 (1996).

The savings and loan, or thrift, industry is one of the businesses most highly regulated by the Government. 518 U.S. at 844. The modern regulatory regime emerged after the Great Depression, when Congress created the Federal Home Loan Bank Board ("the Bank Board"), vested with authority to charter and regulate federal thrifts, and the Federal Savings and Loan Insurance Corporation ("FSLIC"), under the Bank Board's authority, which was given responsibility to insure thrift deposits and regulate all federally-insured thrifts. *See id.*

In the late 1970's and early 1980's, high interest rates and inflation left many thrifts in distress. *See id.* at 845. Many thrifts found themselves holding long-term, fixed-rate mortgages created when interest rates were low; when market rates rose, the thrifts had to raise the rates they paid to depositors in order to attract funds. *See id.* When the costs of short-term deposits overtook the revenues from long-term mortgages, hundreds of thrifts became insolvent. *See id.*

The crisis was exacerbated by initial efforts to resolve it, especially by thrift deregulation, weakening the capital

reserve requirement, and replacing generally accepted accounting principles with new "regulatory accounting principles" for the purpose of determining thrifts' compliance with their capital requirements. *See id.* at 845-46. Combined, these measures encouraged expansion by thrifts into new and riskier fields of investment without a corresponding increase in their capital base, and, in many cases, resulting in weaker institutions. *See id.*

While the regulators tried to mitigate the crisis generally through deregulation, the liabilities of the numerous already-failed thrifts threatened to exhaust FSLIC's insurance reserves. *See id.* at 846. To avoid further insurance liability, the Bank Board decided to induce healthy financial institutions to take over troubled thrifts in a series of "supervisory mergers." *See id.* at 847-48. Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone. *See id.* at 848. Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment—the "purchase method"—that would help the acquiring institutions meet their capital reserve requirements imposed by federal regulations. *See id.*

The critically appealing aspect of the purchase method of accounting is that it permits the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called "goodwill." 518 U.S. at 848-49. Goodwill recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger was generally referred to as "supervisory goodwill." *Id.* at 849. Supervisory goodwill was attractive to healthy thrifts, and thus an essential element in FSLIC's efforts to promote supervisory mergers, because thrift regulators let the acquiring thrifts count supervisory goodwill

toward their regulatory reserve requirements and, conse-
quently, enabled the thrift to leverage more loans. *Id.* at
850-51. Supervisory goodwill was also attractive because the
regulators allowed acquiring thrifts to amortize it over long
periods, up to the 40-year maximum permitted by the gener-
ally accepted accounting practices. *Id.* at 851. In conjunction
with increases in the value of the thrift's loans over the life
of the loans (as redemption of the loan approaches), amortiza-
tion of goodwill resulted in net profits during the initial years
following the acquisition, thus allowing acquiring thrifts to
seem more profitable than they in fact were. *Id.* at 851-53.

B.    The Savings and Loan Crisis—Further Developments

In 1989, unsatisfied with the results of the regulatory
response to the thrift industry crisis and in an effort to prevent
the collapse of the industry, Congress enacted the Financial
Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"). Among other
significant changes, FIRREA required thrifts to "maintain
core capital in an amount not less than 3 percent of the sav-
ings association's total assets" and defined "core capital" to
exclude "unidentifiable intangible assets" such as supervisory
goodwill. *Winstar*, 518 U.S. at 857 (quoting 12 U.S.C.
§§ 1464(t)(2)(A), (9)(A)). These new capital requirements
had swift and severe impact upon institutions that had
acquired failed thrifts, as they had relied on supervisory good-
will and capital forbearance granted them at acquisition. *See
id.*

Three thrift institutions created by way of supervisory
mergers sued for damages on both contractual and constitu-
tional theories. *Id.* at 858. They argued that the Bank Board
and FLSIC had promised them that the supervisory goodwill
created in their merger transactions could be counted toward
regulatory capital reserve requirements. *Id.*

After reviewing the transactions, the Court agreed with the
lower courts that "the realities of the transaction favored read-

ing those documents as contractual commitments, not mere statements of policy . . . ." *Id.* at 863. The Court therefore had "no reason to question the Court of Appeals's conclusion that the government had an express contractual obligation to permit [the plaintiff thrifts] to count supervisory goodwill generated as a result of [their supervisory] merger[s] . . . as a capital asset for regulatory capital purposes." *Id.* at 864 (internal quotation marks omitted). The Court also "accept[ed] the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits" as acceptable regulatory capital. *Id.* at 870.

The Court rejected all special defenses advanced by the Government in its effort to prevent enforcement of the contracts at issue, *see id.* at 860, and affirmed the Federal Circuit's ruling that the United States was liable to the thrifts for breach of contract. *Id.* at 910.

C.   Home Savings' Acquisition of Security Federal Savings and Loan Association, Hamiltonian Federal Savings and Loan Association, and Southern Federal Savings and Loan Association

One of the supervisory mergers undertaken pursuant to the Bank Board's strategy to mitigate the savings and loan crisis involved H.F. Ahmanson & Co. and its wholly-owned subsidiary, Home Savings of America, FSB. On November 5, 1981, Home Savings, at the time a California-chartered thrift, submitted a proposal to acquire Southern Federal Savings and Loan Association ("Southern"), an ailing federally-chartered mutual thrift located in Florida. Home Savings subsequently offered to acquire two other struggling thrifts: Hamiltonian Federal Savings and Loan Association ("Hamiltonian") and Security Federal Savings and Loan Association ("Security"), both located in Missouri. Although other institutions had

expressed interest in acquiring the three thrifts, FSLIC recommended that the Bank Board approve the acquisitions by Home Savings as the proposals least costly to FSLIC.[1]

Following negotiations, FSLIC and Home Savings agreed that the acquisition was to be structured as two separate mergers. First, Hamiltonian and Security was merged into Southern. Southern was then merged into Home Savings, upon which event Home Savings was reorganized into a federally chartered thrift. This second merger was subject to several conditions. Among them was the Bank Board's approval of the transactions accomplished by the two mergers and, additionally, that "FSLIC shall have entered into an agreement with Home [Savings] in form and substance satisfactory to Home [Savings]."

On December 17, 1981, FSLIC and Home Savings entered into an "Assistance Agreement." The agreement referenced the two mergers and stated that FSLIC "has decided, pursuant to § 406(f) of the [National Housing] Act, 12 U.S.C. § 1729(f) (Supp. III 1979), to provide indemnification and/or financial assistance as set forth in this Agreement having determined that each MERGING ASSOCIATION is in danger of default and that the amount of such assistance would be less than the losses [FSLIC] would sustain upon the liquidation of each such MERGING ASSOCIATION through a receivership accompanied by the payment of insurance of accounts."[2] The

---

[1]The Bank Board had to approve all mergers involving thrifts. *See* 12 U.S.C. §§ 1467a(e)(1)(A)-(B), 1817(j)(1) (Supp. V 1981).

According to FSLIC, Home Savings' proposal to acquire Southern, Hamiltonian, and Security would cost FSLIC $2.5 million. This was $252.2 million less than the cost to FSLIC of liquidating the three thrifts and $167.3 million less than the cost to FSLIC of a controlled payout of the thrifts over fifteen years.

[2]The Assistance Agreement's reference to the 1979 supplement of the United States Code, as opposed the 1981 supplement (applicable at the time of the agreement) has no particular relevance. At both times, 12 U.S.C. § 1729(f) read identically. *Compare* 12 U.S.C. § 1729(f) (Supp. III 1979) *with* 12 U.S.C. § 1729(f) (Supp. V 1981).

Assistance Agreement recited that the Home Savings-Southern merger was to be "a tax free reorganization pursuant to Section 368(a)(1)(G) of the Internal Revenue Code . . . ."

The Assistance Agreement contemplated a complex system of assistance to be provided to Home Savings. It included, among other items: indemnification against losses resulting from unreserved-for liabilities or losses arising out of legal challenges to the mergers or the Assistance Agreement; cash contributions equal to the negative net worth, if any, of each merging thrift, with the negative net worth including the amounts by which appraised losses exceeded appraised gains on real estate owned by the merging thrifts as of the effective date of the mergers; and indemnification for indicated losses on "problem loans" of the merging thrifts identified as such during the initial audit.

The obligations of Home Savings and FSLIC under the Assistance Agreement were subject, among other conditions, to the merger of Hamiltonian and Security into Southern, and then of the new Southern into Home Savings. Home Savings' obligations were subject to satisfaction of several additional conditions, among them the Bank Board's issue of the federal charter to Home Savings, a supervisory forbearance letter in approved form, and a letter containing "certifications that grounds specified in 12 U.S.C. § 1464 (d)(6)(A)(i) or (iii) exist or will exist with respect to each MERGING ASSOCIATION. . . ."

The Assistance Agreement contained an integration clause that incorporated by reference "the merger agreement between SOUTHERN and HOME and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or [FSLIC] . . . ." Unless otherwise agreed by the parties, the Assistance Agreement was to terminate after five years.

Also on December 17, 1981, the Bank Board issued Resolution 81-803. The resolution stated that the Bank Board determined that the merger of Southern into Home Savings[3] was "pursuant to an action by the FSLIC to prevent the failure of Southern" and "the insurance liability or risk of the FSLIC will be reduced as a result of" the merger. The resolution explained that these findings constituted certification that the grounds specified in 12 U.S.C. § 1464(d)(6)(A)(i) or (iii) existed and were necessary to ensure that the merger of Southern into Home Savings would qualify as a tax-free reorganization under 26 U.S.C. § 368(a)(1)(G). *See* 26 U.S.C. § 368(a)(3)(D)(ii)(III) (Supp. V 1981).

Also in Resolution 81-803, the Bank Board approved the establishment of Home Savings' Florida and Missouri branches resulting from Home Savings' acquisition of the merging thrifts, and conditionally approved Home Savings' establishment of two more branches in each of those states. As a result, "future applications of Home . . . for permission to establish or maintain branch offices in the State of Florida and Missouri shall be processed . . . as if the home office of Home were located in Florida or Missouri, respectfully [sic]." The resolution authorized the issuance of a letter to Home Savings, also dated December 17, 1981, confirming these branching rights. These rights were valuable to Home Savings because until 1981, Bank Board regulations prohibited thrifts from opening branches outside of the state in which they had their home office.[4]

---

[3]When referring to the Home Savings-Southern merger, we refer to Southern as it existed after the merger of Security and Hamiltonian into it.

[4]In September 1981, the Bank Board issued regulations that made branching rights available, but only if the first branch in the non-home state was acquired in a supervisory merger. *See* 12 C.F.R. § 556.5(a)(3)(ii)(a) (1982 ed.); *Statement of Policy Regarding Supervisory Mergers and Acquisitions*, 46 Fed. Reg. 45120-1, 45,120 (Sept. 10, 1981).

Resolution 81-803 further approved the purchase method of accounting for the acquisition of Southern by Home Savings, and stated that

> the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years . . . .

The parties refer to these rights, cumulatively, as the "RAP rights."

Finally, Resolution 81-803 authorized the issuance of a supervisory forbearance letter. The letter, also dated December 17, 1981, represented that, during the five-year term of the Assistance Agreement, the regulators would waive violations by Home Savings of regulatory reserve and net worth requirements attributable to the merger of Southern into Home Savings. The letter also represented that losses of Southern shall not be deemed to reduce Home Savings' net worth for the purpose of regulations of the Bank Board or for FSLIC's permitting the waiver of net worth requirements.

The merger of Hamilton and Security into Southern, and then Southern into Home Savings proceeded as planned, on the same day as the Assistance Agreement, December 17, 1981.

In the wake of the Supreme Court's decision in *Winstar*, Ahmanson and Home Savings filed their own *Winstar*-like damage suit. The lawsuit concerned several supervisory mergers, including the Southern-Home Savings merger. *See Home*

*Sav. of Am. v. United States*, 50 Fed. Cl. 427, 430-31 (2001) ("*Home I*"), *aff'd* 399 F.3d 1341 (Fed. Cir. 2005). Although Home Savings "tacitly acknowledge[d] the lack of explicit language regarding the inclusion of supervisory goodwill in regulatory capital," *id.* at 434, the court concluded based on its analysis of the Assistance Agreement and the FHLBB Resolution 81-803 that "the [Bank Board] and . . . FSLIC promised that plaintiffs would be able to count supervisory goodwill acquired in the Florida/Missouri . . . transaction[ ] in meeting their regulatory capital requirements until such goodwill was completely amortized." *Id.* at 438. The court then held that "the limitation imposed by FIRREA on plaintiffs' ability to count supervisory goodwill in meeting their regulatory capital requirements constituted a breach of the contracts entered into by plaintiffs and the government in the Florida/Missouri . . . transaction[ ]." *Id.* at 439. In *Home Sav. of Am. v. United States*, 57 Fed. Cl. 694 (2003), *aff'd* 399 F.3d 1341, and *Home Sav. of Am. v. United States*, 70 Fed. Cl. 303 (2006), the court awarded Home Savings a total of $90,360,000 in damages and grossed up the awards for taxes, resulting in a total award of $149,951,000.

D.   Current Litigation

In 1992 and 1993, Home Savings sold its Missouri branches.

In 1998, Washington Mutual acquired Ahmanson and its wholly-owned subsidiaries, including Home Savings. In 2005, Ahmanson filed amended income tax returns, claiming refunds for the years 1990, 1992 and 1993. Ahmanson contended that, for those years, the Internal Revenue Service failed to allow Home Savings amortization deductions for the RAP rights and abandonment loss deductions for its abandonment of the Missouri branching rights. Ahamanson claimed refunds of $91,442,362 each for the years 1990 and 1992 and $8,935,369 for the year 1993. The Service denied the refund requests.

Washington Mutual, as successor in interest to Ahamanson and Home Savings, brought this refund lawsuit. Washington Mutual alleged that Home Savings' tax basis in the RAP rights was $46,809,000 under 26 U.S.C. § 1012, the general cost-basis rule, $63,000,000 under 26 U.S.C. § 362(b), the carryover-basis rule applicable to tax-free reorganizations, or $63,000,000 under 26 U.S.C. § 597, regarding assistance received from FSLIC under 12 U.S.C. § 1729(f). Based on those figures, Washington Mutual alleged that Home Savings was entitled to amortization deductions for the RAP rights for each year of either $6,436,238 or $8,662,500 (based on the accelerated five-year phase-out under FIRREA), or $1,170,225 or $1,575,000 (based on the initial 40-year life under the Assistance Agreement). Alternatively, Washington Mutual alleged that, if there were separate RAP rights associated with Home Savings' Missouri branches, then it was entitled to abandonment loss deductions for the years 1992 and 1993 equal to any remaining unamortized basis in those rights, pursuant to 26 U.S.C. § 165.

Washington Mutual further alleged that Home Savings' tax basis in the Missouri branching rights was $25,605,000 under 26 U.S.C. § 1012 or $35,000,000 under § 362(b) or § 597. It therefore argued that Home Savings was entitled to an abandonment loss deduction for 1992 in an unspecified amount with respect to the branching rights associated with the branches divested in that year and an abandonment loss deduction for 1993 of either $25,605,000 or $35,000,000.

Finally, Washington Mutual argued that, to the extent Home Savings was not entitled to recover its alleged basis in the Missouri branching rights or in any separate RAP rights associated with the Missouri branches through loss or amortization deductions, those amounts should be added to Home Savings' basis in those branches in computing its gain or loss on its sales of the branches in 1992 and 1993.

Based on the above figures, Washington Mutual sought a total minimum refund of $15,542,584.

Both Washington Mutual and the United States filed motions for partial summary judgment on the issue of Home Savings's tax basis in the RAP rights and the Missouri branching rights.

Washington Mutual contended that, under the doctrine of collateral estoppel, the *Winstar*-type litigation between Home Savings and the United States conclusively established that "(1) Home contracted with FSLIC; (2) Home received the Branching Rights and RAP Right as consideration or inducement from FSLIC; and (3) Home's consideration for the Rights was the assumption of FSLIC's liability." Therefore, Washington Mutual argued, Home Savings had a cost basis in the Rights equal to FSLIC's liability on account of and to the extent of the three acquired thrifts' inability to satisfy its depositors, that is, an amount equal to "the excess of the total liabilities over the current fair market value of the failed thrifts' assets." Washington Mutual argued alternatively that Home Savings had a fair market value basis in the Rights because they were granted as an inducement to enter into the supervisory merger. Thus, Washington Mutual reasoned, the Rights qualified as "assistance" under 12 U.S.C. § 1729(f) and no reduction in the tax basis of Home Savings' assets was to be taken by reason of that assistance, pursuant to 26 U.S.C. § 597.[5]

The United States attacked both Washington Mutual's theories as an effort to get "double recovery." It argued that recognizing Home Savings a cost basis in the Rights based on the assumption of FSLIC's liabilities requires characterizing some of the acquired thrifts' liabilities as FSLIC's liabilities, because Home Savings did not pay FSLIC or the Bank Board separate consideration for the Rights. In the United States' view, that would be inconsistent with the supervisory merger's treatment as a tax-free "G" reorganization, which

---

[5]Washington Mutual's partial summary judgment motion did not address its third tax basis theory, premised on 26 U.S.C. § 362(b).

requires, among other conditions, that Home Savings assume "substantially all" of Southern's liabilities as a result of the merger. *See* 26 U.S.C. § 368(a)(3)(D)(ii)(II) (Supp. V 1981).

The United States also argued that neither the branching rights nor the RAP rights qualified for tax-free treatment under 26 U.S.C. § 597 because, in its view, that section concerns financial assistance provided by FSLIC pursuant to 12 U.S.C. § 1729(f) and not non-financial intangibles.

The district court granted partial summary judgment in favor of the United States. Preliminarily, the district court held that neither *Winstar* nor the decisions issued in the *Winstar*-type lawsuit between Home Savings and the United States decided the precise issues raised by this case.

The district court rejected Washington Mutual's cost basis theory. The court first rejected the distinction drawn by Washington Mutual between the acquired thrifts' liabilities and FSLIC's insurance liabilities with respect to those thrifts, holding that they were "one and the same" and that the merger did not relieve FSLIC of its insurance obligations, but only that those obligations were "simply less likely to come to fruition." It further held that Home Savings received the Rights as part of the same transaction encompassing the merger, and not as a separate transaction. Finally, the district court reasoned that Home Savings did not bargain for the right to assign a basis to the Rights and that whatever tax benefits were conferred were limited to the tax-free "G" reorganization, for which the parties specifically bargained.

The district court also rejected Washington Mutual's fair market value theory. The court held that the Rights do not qualify as assistance under 26 U.S.C. § 597, which the district court determined is limited to financial assistance received under 12 U.S.C. § 1729(f).

After the parties settled Washington Mutual's other claims, the district court entered judgment in favor of the United

States with respect to Washington Mutual's claim that it had a cost basis or a fair market value basis in the Rights and rejected Washington Mutual's amortization and loss deduction-related refund requests.

Washington Mutual appeals.

## DISCUSSION

We review de novo a district court's grant of partial summary judgment. *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1116 (9th Cir. 2004). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy is a question of law suitable for disposition on summary judgment. *Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003).

Before turning to the merits, we address Washington Mutual's argument that the doctrine of collateral estoppel precludes relitigating the two underlying issues presented by this case: (1) whether Home Savings received the Rights in exchange for its assumption of FSLIC's liabilities on account of and to the extent of the three failing thrifts' inability to satisfy their liabilities to their depositors; and (2) whether Home Savings received the Rights from FSLIC as an inducement to the supervisory merger, pursuant to 12 U.S.C. § 1729(f).

Collateral estoppel, or issue preclusion, bars the relitigation of both issues of law and issues of fact actually adjudicated in previous litigation between the same parties. *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 910 (9th Cir. 1997). Collateral estoppel applies not only against actual parties to prior litigation, but also against a party that is in privity to a party in previous litigation. *Id*.

In *Home I*, the Court of Federal Claims held, in relevant part, that: (1) the Bank Board Resolution 81-803, incorporated by reference in the Assistance Agreement, contained an enforceable promise that supervisory goodwill would count in Home Savings' meeting regulatory capital requirements until such goodwill was completely amortized; and (2) the limitations imposed by the government in FIRREA constituted a breach of that promise. *Home I*, 50 Fed. Cl. at 434-39. This holding does not reach the issues raised in the current litigation. Collateral estoppel therefore does not apply. We now turn to the merits.

Washington Mutual's main theory on appeal is that the Assistance Agreement, the Bank Board Resolution 81-803, and the December 17, 1981, supervisory forbearance and branching rights letters memorialized a three-party transaction in which Home Savings agreed to acquire Hamilton, Security, and Southern, and thereby relieve FSLIC of its impending insurance liability to the depositors of those ailing thrifts, in exchange for the branching rights and the RAP rights. Washington Mutual contends that the cost to Home Savings to acquire the Rights was the amount by which the acquired thrifts' liabilities exceeded the value of their assets, also referred to as "excess liability." Washington Mutual therefore concludes that Home Savings took a tax basis in the Rights equal to that excess liability, pursuant to 26 U.S.C. § 1012.

The United States counters that, although Home Savings lessened FSLIC's insurance risks by engaging in the supervisory merger, the only liabilities it assumed through the merger were those belonging to the three failing thrifts. The United States also argues that Washington Mutual's theory presupposes that Home Savings acquired some of the failing thrifts' liabilities outside the merger. This, the United States further argues, is inconsistent with the supervisory merger's treatment as a tax-free "G" reorganization, which requires that Home Savings had assumed "substantially all" of Southern's liabilities as a result of the merger.

I

**[1]** This case requires us to return to the very basics of tax law. The term "basis" is a fundamental concept and refers to a taxpayer's capital stake in an asset for tax purposes. *See In re Lilly*, 76 F.3d 568, 572 (4th Cir. 1996). It is taken into account as an offset to the amount realized (or a measurement of loss) upon the disposition of the asset, or, in the case of certain business and investment assets, in the form of depreciation or amortization deductions over the life of the asset. *See id.*

**[2]** Generally, a taxpayer's basis in an asset is equal to the cost to the taxpayer of acquiring the asset. 26 U.S.C. § 1012.[6] *See also*, *e.g.*, *Peracchi v. Comm'r*, 143 F.3d 487, 490 (9th Cir. 1998). The term "cost" generally includes any assumption of the seller's liabilities. *See Comm'r v. Oxford Paper Co.*, 194 F.2d 190, 192 (2d Cir. 1952). *See also Oxford Life Ins. Co. v. United States*, 790 F.2d 1370, 1374 (9th Cir. 1986) ("Where a taxpayer acquires all the assets of another in a transaction, the amount of liability assumed is treated as part of the cost of acquiring the tangible and intangible assets received."). The cost-basis rules apply equally to tangible and intangible property. *See Tenneco, Inc. v. United States*, 433 F.2d 1345, 1346 (5th Cir. 1970).

As an overarching principle, absent specific provisions, the tax consequences of any particular transaction must reflect the economic reality. *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 766 (Fed. Cl. 1994). *See also Winstar*, 518 U.S. at 863.

---

[6]That section provides: "The basis of property *shall be* the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)." 26 U.S.C. § 1012 (emphasis added). Neither Washington Mutual nor the United States argue, on this appeal, that any of the exceptions provided for in 26 U.S.C. § 1012 applies.

**[3]** The documentary evidence, as well as the economic realities of the transaction, compel the conclusion that the Home Savings-Southern supervisory merger and the Assistance Agreement between FSLIC and Home Savings comprise one, all-encompassing transaction wherein the branching rights and the RAP rights were part of the consideration received by Home Savings. The merger agreement between Home Savings and Southern was conditioned upon Home Savings and FSLIC having entered into the Assistance Agreement. Conversely, the Assistance Agreement was conditioned upon the merger having been accomplished. The Assistance Agreement was also conditioned upon several actions by the Bank Board, which issued Resolution 81-803, the letter regarding branching rights, and the supervisory forbearance letter. The Assistance Agreement explicitly integrated the Home Savings-Southern merger agreement, Resolution 81-803, and the two Bank Board letters into the agreement, providing:

> This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the merger agreement between SOUTHERN and HOME and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or [FSLIC], *provided*, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the merger agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of [FSLIC] are concerned.

The Home Savings-Southern merger, the Assistance Agreement, Resolution 81-803, and the Bank Board letters confirm-

ing the branching rights and the supervisory forbearance were all signed or issued on December 17, 1981.

**[4]** The conditioning of the Home Savings-Southern merger and the Assistance Agreement each upon the other, their synchronized timing, and, most importantly, the integration of the merger agreement into the Assistance Agreement, conclusively establish that Home Savings and FSLIC intended that the two transactions be integrated. The dependence of the merger and the assistance agreement each upon the other conforms to the economic realities. FSLIC had no interest in offering Home Savings any incentives without the guarantee of an immediate return. In the context of the savings and loan crisis, that return was the assimilation of three failing thrifts by a healthy one, thereby considerably reducing FSLIC's own insurance liability exposure on account of the failing thrifts' deposit liabilities and contributing to the effort to stabilize the thrift industry. *See Winstar*, 518 U.S. at 846-47 ("[T]he multitude of already-failed savings and loans confronted FSLIC with deposit insurance liabilities that threatened to exhaust its insurance fund. . . . Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.' "). On its part, Home Savings had no interest in acquiring the three failing thrifts absent incentives from the government to compensate for the assumption of liabilities well in excess of the value of the thrifts' assets. *See id.* at 848 ("Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions . . . . Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.").

Home Savings, indeed, received a generous incentive package, reflected in the Assistance Agreement, Resolution 81-803, the Bank Board letter regarding the branching rights, and the supervisory forbearance letter. That package included, among other items, cash contributions from FSLIC equal to the negative worth of the three acquired thrifts; various indemnities; and the branching rights and the RAP rights. Furthermore, FSLIC and Home Savings negotiated that the Home Savings-Southern merger be structured as a tax-free "G" reorganization, to which purpose the Bank Board made, in Resolution 81-803, the necessary determinations in order for the transaction to so qualify. *See* 26 U.S.C. § 368(a)(3)(D)(ii)(III) (Supp. V 1981).

**[5]** The cost to Home Savings for acquiring these various incentives and benefits was the excess of the three failing thrifts' liabilities over the value of their assets.[7] Home Savings, therefore, received a cost basis in the branching rights and the RAP rights equal to *some part* of the total amount of that excess liability.[8]

---

[7]According to a December 16, 1981, FSLIC memorandum to the Bank Board, Home Savings estimated at that time that the supervisory goodwill arising from the mergers would be approximately $150 million. Goodwill, of course, is "the excess of the purchase price over the fair value of all identifiable assets acquired." *Winstar*, 518 U.S. at 848-49. The parties, therefore, entered the transaction with a pretty clear picture of the cost incurred by Home Savings by engaging in the mergers. We do not express, however, any opinion on whether the parties are bound by that estimate.

[8]We note here that Washington Mutual argues that the cost to Home Savings for acquiring the Rights was the excess of the acquired thrifts' liabilities over their assets. The Rights, however, were part of a complex consideration package, all of which was acquired by Home Savings in exchange for its assumption of the thrifts' liabilities. The issue of how to allocate that cost among the various components of Home Savings' consideration package is not before us.

II

The United States contends that allowing Home Savings a cost basis in the Rights is incompatible with the Home Savings-Southern merger being recognized as a tax-free "G" reorganization. The United States relies on Washington Mutual's statement that Home Savings obtained the Rights "outside the framework of the merger." The United States reads this statement as saying that Home Savings acquired some of Southern's liabilities "outside the framework of the merger." If so, that was in violation of the tax-free "G" reorganization requirement that "substantially all" of the transferor's liabilities be acquired by the acquiring institution in the transfer. *See* 26 U.S.C. § 368(a)(3)(D)(ii)(II) (Supp. V 1981).

Special rules apply when a corporation acquires assets in a tax-free reorganization under 26 U.S.C. § 368. The recipient corporation takes a carryover basis in the assets of the transferor (that is, it assumes the basis the property had in the hands of the transferor), increased by the amount of gain, if any, recognized by the transferor in the transfer. 26 U.S.C. § 362(a)(2), (b).

**[6]** A "G" reorganization is a § 368 court-approved transfer by a corporation of all or part of its assets to another corporation in a bankruptcy, receivership, foreclosure, or similar judicial proceeding, provided generally that the owners of the transferor corporation receive stock or securities of the transferee corporation pursuant to the plan of reorganization. 26 U.S.C. § 368(a)(1)(G), (3)(A), (3)(B). Under former § 368(a)(3)(D)(ii), a transfer of assets by a thrift could qualify as a "G" reorganization even if its owners did not receive stock or securities of the transferee corporation, but only if (1) the thrift transferred substantially all of its assets to the transferee corporation, (2) substantially all of the liabilities of the transferring thrift immediately before the transfer became liabilities of the transferee corporation as a result of the transfer, and (3) the Bank Board or FSLIC certified the existence of a

ground for appointing a receiver for the transferor thrift specified in 12 U.S.C. § 1464(d)(6)(A)(i) (insolvency), (ii) (dissipation of assets), or (iii) (unsafe or unsound business conditions). *See* 26 U.S.C. § 368(a)(3)(D)(ii) (Supp. V 1981); 12 U.S.C. § 1464(d)(6)(A)(i)-(iii) (1976 & Supp. V 1981).

At issue here is the second requirement, whether substantially all of Southern's liabilities became liabilities of Home Savings as a result of the supervisory merger. To argue that this requirement is not met, the United States seizes on isolated, out-of-context statements made by Washington Mutual in its effort to explain the complex nature of the transaction between Home Savings and FSLIC, and to explain why Home Savings took a cost basis in the Rights. There is no denying that Washington Mutual struggled to try to explain its cost basis theory. Washington Mutual, however, has never contended that Home Savings acquired any portion of Southern's liabilities outside the merger. Its theory has always been that Home Savings acquired *the Rights* outside the merger, through the Assistance Agreement, in exchange for relieving FSLIC of its impending insurance liability on account of Southern's liabilities to depositors.

**[7]** Furthermore, as we have explained, the Home Savings-Southern merger and the assistance agreement between Home Savings and FSLIC are integral parts of one, all-encompassing transaction wherein Home Savings acquired Southern's excess liability in exchange for a complex consideration package that included structuring the merger as a tax-free "G" reorganization. For this purpose, the Home Savings-Southern merger agreement explicitly provided that

> all assets and property of every kind and character, real, personal and mixed, tangible and intangible, choses in action, rights and credits then owned by [Southern], or which would inure to it, shall immediately . . . be vested in and become the property of the [Home Savings] . . . . All rights, duties and obliga-

tions of [Southern] shall remain unimpaired, and [Home Savings] shall, on the Effective Date, succeed to all of such rights and assume all of such duties and obligations.

**[8]** Home Savings acquired "substantially all" of Southern's liabilities in one transfer and met all other requirements of 26 U.S.C. § 368(a)(3)(D)(ii) (Supp. V 1981). Recognizing that Home Savings had a cost basis in the branching rights and the RAP rights is not incompatible with the Home Savings-Southern merger being recognized as a tax-free "G" reorganization.

### III

The district court also held that FSLIC and Home engaged in one transaction wherein Home Savings agreed to acquire the three failing thrifts and to assume their duties and obligations in exchange for "the package of regulatory 'carrots' contained in the Assistance Agreement." Nonetheless, the district court held that Home Savings did not take a basis in the Rights because it did not bargain for it and "[a]s a matter of general contract interpretation, it makes more sense to conclude that whatever tax benefits were conferred came with the part of the aid package specifically concerning taxation: the 'G' reorganization."

The United States wisely does not make this argument on appeal. First, what Home Savings bargained for was not that it would not have to pay taxes on the merger, but that the merger would be structured to qualify as a tax-free "G" reorganization. The tax-free treatment resulted not from that structure, but by operation of the Internal Revenue Code. Similarly, the tax treatment of the Rights depends not on the agreement of the parties on the issue, but on the provisions of the Internal Revenue Code, as applied to the parties' transaction.

**[9]** Second, that Home Savings and FSLIC bargained for structuring the merger as a tax-free "G" reorganization, but did not also bargain for the tax treatment of the Rights, does not mean we cannot recognize Home Savings' cost basis in the Rights. Because the tax consequences of a transaction flow by operation of the tax law, the parties' failure to anticipate and negotiate all tax consequences of their transaction cannot be interpreted as limiting the transaction's tax consequences to only those expressly anticipated and bargained over by the parties. That one party to this litigation was a governmental entity is no reason to depart from this basic principle.

IV

"[W]here a transaction has economic substance and is economically realistic, it should be recognized for tax purposes, and the fact that a transaction is so arranged that the tax consequences are highly favorable to one of the parties affords the Commissioner no license to recast it into one of less advantage." *Lewis & Taylor, Inc. v. Comm'r*, 447 F.2d 1074, 1077 (9th Cir. 1971). Here, Home Savings agreed to acquire Security, Hamiltonian, and Southern, whose liabilities far exceeded their assets, in exchange for a complex consideration package including, among other items, cash, indemnities, the branching and the RAP rights, and the structuring of the merger as a tax-free "G" reorganization. To this transaction, we apply basic tax principles regarding basis. This leads us to hold that Home Savings had a cost basis in the Rights equal to some part of the acquired thrifts' excess of liabilities over the value of their assets.[9]

---

[9]Because Washington Mutual prevails on the cost-basis theory, we need not address its alternative theory, that it should be recognized a fair market value basis because the Rights were "assistance" provided by FSLIC to facilitate a supervisory merger, and therefore should receive the favorable tax treatment afforded by 26 U.S.C. § 597 (Supp. V 1981).

**[10]** The district court's judgment and grant of the United States' motion for partial summary judgment is REVERSED. The case is REMANDED to the district court with instructions to grant Washington Mutual's motion for partial summary judgment. It shall proceed to determine the cost basis and conduct further proceedings in accordance to this opinion.

REVERSED and REMANDED.

---

FERNANDEZ, Circuit Judge, concurring:

I am not satisfied that Washington Mutual, Inc. ("WaMu") can establish a cost basis in the rights that the government gave Home Savings of America ("Home Savings") when Home Savings took over other savings and loan institutions pursuant to a tax-free "G" reorganization.[1] However, I concur in the result on a different ground — those rights have a fair market value basis.[2]

WaMu, successor in interest to Home Savings, brought this action to recover income taxes that Home Savings allegedly overpaid to the United States. The district court granted summary judgment to the government, and this appeal followed.

WaMu asserts that the regulatory accounting privileges ("RAP") and the branching rights (hereafter collectively "the Rights") received from the Federal Savings and Loan Insurance Corporation ("FSLIC") as part of an Assistance Agreement between FSLIC and Home Savings have a fair market value basis.[3] WaMu appears to be correct; surely they had great value, which is why the transaction went forward. How-

---

[1] 26 U.S.C. § 368(a)(1)(G).

[2] I therefore see no need to wrestle with the question of cost basis at this time.

[3] *See* 26 U.S.C. § 61(a)(1); 26 C.F.R. § 1.61-2(d)(1).

ever, the government asserts three reasons that WaMu is in error. I reject those reasons.

First, the government says, the Rights were not received from FSLIC at all, but were received from the Federal Home Loan Bank Board ("the Board"). I disagree. No doubt the Rights did flow from actions of the Board, but, then, FSLIC is just an arm of the Board and is operated by the Board. *See United States v. Winstar Corp.*, 518 U.S. 839, 890, 116 S. Ct. 2432, 2462, 135 L. Ed. 2d 964 (1996); *see also* 12 U.S.C. § 1725(a). Indeed, the Board operates through FSLIC. *See Winstar*, 518 U.S. at 891, 116 S. Ct. at 2463. So, it is almost tautological to say that what FSLIC gave originated at the Board. What is significant, however, is that the Assistance Agreement was the contract between FSLIC and Home Savings and that agreement incorporates the Board resolutions that ultimately conferred the Rights upon Home Savings. It cannot be doubted that the Rights were received from FSLIC as part of the compensation to Home Savings when it, at the urging of FSLIC, merged with a number of insolvent savings and loan institutions.

Second, the government argues that the Rights were not given to Home Savings under the provisions of 12 U.S.C. § 1729(f). Again, I must disagree. If the Rights were not conveyed pursuant to that provision, it is difficult to see how they were conveyed at all because that is *the* provision that grants FSLIC the authority to enter into agreements and issue benefits to an insured institution, like Home Savings, for the purpose of facilitating a transaction of this type. It is already established beyond peradventure that § 1725(f) provided FSLIC's authority to grant the RAP rights to Home Savings. *See Winstar*, 518 U.S. at 890, 116 S. Ct. at 2462. Assuming that the branching rights could be granted at all, and the government agrees that they could be, I see no principled basis for declaring that, unlike the RAP rights, they did not flow through FSLIC to Home Savings via the Assistance Agreement.

Third, the government argues that even if the above is true, Home Savings was not entitled to the beneficial treatment granted by 26 U.S.C. § 597 (1981),[4] a provision enacted for the very purpose of facilitating the kind of transaction that occurred here. At first blush, it is difficult to see why it was not. Well, says the government, § 597 only applies to "money or other property" and the Rights are neither. Why not? Because, says the government, the section is entitled "FSLIC financial assistance" and the Rights cannot be financial. Again, it is difficult to see why that would be so. In the first place, although titles might be helpful sometimes, they are not necessarily a good guide. In fact, in a tax case, we held that "the title of a statute cannot limit the plain meaning of its text." *Nordby Supply Co. v. United States*, 572 F.2d 1377, 1378 (9th Cir. 1978); *see also* 26 U.S.C. § 7806(b). Secondly, the word "financial" does not exclude the concept of property, and the words of the section itself demonstrate that. Finally, there can be no doubt that the parties knew that the Rights would aid Home Savings financially. Those rights were the property that made the deal viable. It seems peculiar to say that they are not the "property" referred to in § 597 because that property can only be money or things like money. Can it

---

[4]The section read as follows:

§ 597. FSLIC financial assistance.

(a) Exclusion from gross income.

Gross income of a domestic building and loan association does not include any amount of money or other property received from the Federal Savings and Loan Insurance Corporation pursuant to section 406(f) of the National Housing Act (12 U.S.C. sec. 1725(f)) regardless of whether any note or other instrument is issued in exchange therefor.

(b) No reduction in basis of assets.

No reduction in the basis of assets of a domestic building and loan association shall be made on account of money or other property received under the circumstances referred to in subsection (a).

be thought that Congress did not understand the broad meaning of the word "property" in general? I think not.

Moreover, says the government, the legislative history[5] refers to "payments" and that can only mean money. Again, I fail to see why one cannot pay over consideration or pay debts with property, and people often do. Moreover, the fact that § 597 refers to an "amount" does not change the analysis. Clearly, the whole of the phrase is "amount of money or other property." In the first place, the word "amount" could be taken as modifying the word money only, in which case the word "property" would stand alone. In the second place, there is nothing peculiar about speaking of an amount of property, if "amount" modifies that word also. For example, in 26 U.S.C. § 301(c) a stockholder, who receives a distribution from a corporation, is taxed on the amount of the distribution. And for that purpose, the word "amount" means "amount of money received,"[6] plus "the fair market value of the other property received."[7] Finally, the net effect of the government's position would be to essentially read the word "property" out of § 597. I see no basis for that reading.

In short, on its face § 597 appears to provide that when Home Savings received the Rights, those constituted property with a significant value and Home Savings was entitled to have that property treated for tax purposes under those provisions. Nothing the government has argued changes that. Thus, WaMu has a fair market value basis in the Rights.

Home Savings greatly benefitted the government at a time of great need. When Home Savings agreed to engage in the mergers in question, it was given the Rights as part of the inducement to do so. The Rights were no mere lagniappe;

---

[5]*See* H.R. Conf. Rep. No. 97-215, at 284 (1981), *reprinted in* 1981-2 C.B. 481, 526.

[6]26 U.S.C. § 301(b)(1)(A).

[7]*Id.* at (b)(1)(B)(i).

they had substantial value. Whether one accepts the analysis of the majority or mine, the result is that Home Savings did have a basis in them.

Thus I concur in the result.