**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BENNETT DORRANCE; JACQUELYNN DORRANCE,

*Plaintiffs-Appellees/ Cross-Appellants*,

v.

UNITED STATES OF AMERICA,

*Defendant-Appellant/ Cross-Appellee.*

Nos. 13-16548
13-16635

D.C. No.
2:09-cv-01284-GMS

AMENDED OPINION

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted
April 9, 2015—Pasadena, California

Filed December 9, 2015
Amended December 30, 2015

Before: Stephen Reinhardt, M. Margaret McKeown,
and Milan D. Smith, Jr. Circuit Judges.

Opinion by Judge McKeown
Dissent by Judge Milan D. Smith, Jr.

# SUMMARY[*]

### Tax

The panel reversed the district court's denial of the government's motion for summary judgment in a tax refund action involving the calculation of the cost basis of stock received through demutualization.

Taxpayers received and then sold stock derived from the demutualization of five mutual insurance companies from which they had purchased life insurance policies. Taxpayers initially asserted a zero cost basis in the stock and paid tax on the gain, but later claimed a full refund. The district court held that taxpayers had a calculable basis in the stock and were therefore entitled to a partial refund.

The panel held that the Internal Revenue Service properly denied the refund claim and that the district court had erred in its cost basis calculation because taxpayers had not met their burden of showing that they had in some way paid for the stock.

The panel explained that under the life insurance policies, taxpayers were entitled to certain contractual rights such as a death benefit, the right to surrender the policy for cash value, and annual dividends. After demutualization, taxpayers retained their contractual interests and continued to pay the same premiums. Taxpayers as policyholders also had certain membership rights for which they received nothing upon

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

demutualization. The stock they received was due to the legal requirement that the insurance companies produce a "fair and equitable" allocation of each company's surplus at the time of demutualization, but evidence showed that this was not based on some premium value that taxpayers had paid in the past.

Judge M. Smith dissented. He agreed with the district court's cost basis calculation, and disagreed with the majority's view that taxpayers paid nothing for their membership rights.

## COUNSEL

M. Todd Welty (argued) and Laura L. Gavioli, McDermott Will & Emery LLP, Dallas, Texas, for Plaintiffs-Appellees/Cross-Appellants.

Kathryn Keneally, Assistant Attorney General; Tamara W. Ashford, Principal Deputy Assistant Attorney General; Gilbert S. Rothenberg, Jonathan S. Cohen, and Judith A. Hagley (argued), Attorneys, United States Department of Justice, Tax Division, Washington, D.C., for Defendant-Appellant/Cross-Appellee.

## OPINION

McKEOWN, Circuit Judge:

This appeal requires us to "return to the very basics of tax law" and consider whether taxpayers had a cost basis in assets that they later sold, but for which they paid nothing.

*Washington Mut. Inc. v. United States*, 636 F.3d 1207, 1217
(9th Cir. 2011).  The specific question we address is whether
a life insurance policyholder has any basis in a mutual life
insurance company's membership rights.  This issue, one of
first impression in our circuit, arises out of a trend in the late
1990s and early 2000s towards the "demutualization" of
mutual life insurance companies.  As many mutual insurance
companies transformed into stock companies, the surplus
resulting from the sale of shares in the company was divided
among current policy holders, often in the form of stock.

Bennett and Jacquelyn Dorrance received and then sold
stock derived from the demutualization of five mutual life
insurance companies from which they had purchased policies.
The Dorrances initially asserted a zero cost basis in the stock
and paid tax on the gain.  They later claimed a full refund on
the taxes they paid upon on the sale of the stock, either
because the stock represented a return of previously paid
policy premiums or because their mutual rights were not
capable of valuation and, therefore, the entire cost of their
insurance premiums should have been counted toward their
basis in the stock.  The government takes the position that the
Dorrances are not entitled to any refund; since they paid
nothing for their membership rights, their basis was zero.
The district court held that the Dorrances had a calculable
basis in the stock, albeit not at the level the taxpayers
claimed, and thus they were entitled to a partial refund from
the Internal Revenue Service ("IRS").    We disagree.
Taxpayers who sold stock obtained through demutualization
cannot claim a basis in that stock for tax purposes because
they had a zero basis in the mutual rights that were
extinguished during the demutualization.

## BACKGROUND

### A. MUTUAL INSURANCE COMPANIES

The first life insurance company in America was a mutual company called the Presbyterian Minister's Fund, organized in 1759 in Philadelphia.[1] For centuries, mutual insurance companies have provided a structure for collecting policyholder premiums and spreading risk and surplus among policyholders, while maintaining policyholder ownership of the company. Mutual insurance companies are distinct from stock companies in that they are owned by the policyholders, not by stockholders. *See* Edward X. Clinton, *The Rights of Policyholders in an Insurance Demutualization*, 41 Drake L. Rev. 657, 659 (1992). To ensure that they can pay all of the contractual benefits, these mutual insurance companies generally charge slightly higher rates than other life insurance providers. Surplus is returned to the policyholders in dividends. For decades (and even more than a century for some mutual companies) policyholders joined, became members, and terminated their policies without getting anything back for membership rights.

Starting in the middle of the twentieth century and increasing through the 1980s, the mutual model became less economically advantageous when compared to stock companies. *Id*. *See also* Paul Galindo, *Revisiting the 'Open*

---

[1] Even earlier, in 1752, Benjamin Franklin, who had likely become aware of similar innovations in England, formed the Philadelphia Contribution for the Insurance of Houses From Loss by Fire, often characterized as the first mutual insurance company. *See* The Philadelphia Contributionship, *Company History* (2015), http://www.contributionship.com/history/index.html.

*Transaction' Doctrine: Exploring Gain Potential and the Importance of Categorizing Amounts Realized*, 63 Tax L. 221, 226 (2009).    The economic advantage of stock companies comes, in large part, from the fact that they can raise capital by selling shares, whereas mutual companies are able to raise capital only by increasing the number of policies sold or by reducing costs.   Additionally, stock companies have a greater capacity to diversify, which provides an additional layer of financial stability.  *See* Clinton, *supra*, at 667.

In response to the challenges faced by mutual insurance companies, in the mid-to-late 1990s many states changed their insurance laws to permit "demutualization" of mutual insurance companies.   Demutualization entails the legal transformation of a mutual company into a stock company. *See* Jeffrey A. Koeppel, The State of Demutualization, at v (2d ed. 1996).  As a consequence, by the late 1990s and early 2000s, many mutual insurance companies had transformed into stock companies.

The rapid shift toward demutualization was made possible only by this widespread change in state insurance law. Clinton, *supra*, at 674.  Although state laws vary, including in the scope of regulatory oversight, the demutualization process occurred under operation of law and was monitored by external insurance regulators.   *Id*. at 665.   Because policyholders exert only weak influence over the mutual company's governance (each policyholder has only one vote, out of possible thousands, regardless of the size of the policy), external regulators focused on ensuring a fair and equitable legal transformation of the insurance companies. *Id*. at 678.

**B. THE DORRANCES' MUTUAL LIFE INSURANCE POLICIES**

Bennett Dorrance is the grandson of the founder of the Campbell Soup Company. At the time the Dorrances purchased life insurance policies from five mutual insurance companies[2] in 1996[3], their net worth was approximately $1.5 billion. They bought the policies to cover estate tax for their heirs. Over time, the Dorrances paid premiums totaling $15,265,608. While that sum is definitely substantial, the face value of the policies totaled just under $88 million, such that they would have received a huge contractual payout upon death.

The Dorrances' contractual rights under the policies entitled them to (1) a death benefit; (2) the right to surrender the policy for "cash value"; and (3) annual policyholder dividends representing the policyholder's portion of the company's "divisible surplus." As policyholders, they also had certain membership rights. Specifically, they were entitled to a portion of any surplus in the event of a solvent

---

[2] The companies are: Prudential Insurance Company; Sun Life Assurance Company; Phoenix Home Life Mutual Insurance Company; Principal Life Insurance Company; and Metropolitan Life Insurance Company ("MetLife").

[3] By 1996, many states already allowed demutualization or were in the process of changing their laws. Demutualization was permitted under New York and Iowa law (governing MetLife, Phoenix, and Principal). *See* NY Ins. Law § 7312 (McKinney 2011); Iowa Code § 508B.1 *et seq*. The New Jersey demutualization statute (governing Prudential) became effective in July 1998. N.J. Stat. Ann. 17:17C-1. In 1999, Canadian regulations (governing Sun Life) were revised to allow for demutualization. Mutual Company (Life Insurance) Conversion Regulations SOR/99-128 s.14 (Can.).

liquidation and to certain voting rights. The Dorrances'
membership rights in the mutual insurance companies were
not transferable or separable from the insurance policy. If the
policies terminated, so too would the membership rights,
without any rebate or additional compensation. Voting and
other membership rights were governed by state law and
company charter.

In 2000 and 2001, each of the insurance companies from
which the Dorrances bought policies demutualized. Post-
demutualization, the Dorrances no longer held any mutual
membership rights, but they retained their contractual
interests under the insurance policies and continued to pay the
same premiums.

Government regulators (both in the United States and
Canada) required the insurance companies to produce a "fair
and equitable" allocation of the company's surplus at the time
of demutualization. Mutual insurance companies complied
with this requirement in a variety of ways, but the companies
in question here opted to issue stock to their policyholders.

When determining how many shares of stock to distribute
to each policyholder, the insurance companies calculated
(1) a fixed component for the loss of voting rights, as every
policyholder was entitled to a single vote regardless of policy
size, and (2) a variable component for the loss of other
membership rights, which was calculated based on the
policyholder's past and projected future contributions to the
company's surplus. As the government's expert report
explained, each company used a different allocation
calculation to arrive at a distribution that was "fair and
equitable" to policyholders. MetLife, for example, "aimed
for around 20%" for the fixed portion, but stated this was a

"general target." Sun Life did not consider policyholders' contribution to surplus in its allocation calculation, but rather looked at the cash value and annual premiums of eligible policies.

Prior to demutualization, the insurance companies each obtained a ruling from the IRS that the stock ownership company resulting from the demutualization qualified as a tax-free organization under Internal Revenue Code, I.R.C. § 368.

Upon demutualization, the Dorrances received 58,455 shares in Prudential, 3,209 shares in Sun Life, 1,601 shares in Phoenix, 5,039 shares in Principal, and 2,721 shares in MetLife. At the time of receipt, the market value of the stock derived from these policies totaled $1,794,771. As the government's expert report explained: "Some may think that the cash paid out in demutualization comes from the distribution of positive surplus of the mutual company; however, such is not the case. The cash actually comes from new stockholders which subscribe to the IPO [initial public offering] . . . ."

In 2003, the Dorrances sold all of the stock for $2,248,806. On their 2003 tax return, in compliance with IRS policy, the Dorrances listed their basis in the stock as zero, reported the $2,248,806 as capital gain, and paid the tax due on that gain. *See* Rev. Rul. 71-233, 1971-1 C.B. 113; Rev. Rul. 74-277, 1974-1 C.B. 88.

## C. PRIOR PROCEEDINGS

By 2007, the Dorrances had a change of heart. They filed a tax refund claim with the IRS, in which they argued that

they owed no taxes on the stock sale because it represented a return on previously-paid insurance policy premiums. The IRS did not issue a final determination on the 2007 claim, so the Dorrances filed a complaint in district court. The IRS argued that the Dorrances had a zero basis in their stock because the life insurance premiums that they paid were not in exchange for membership rights in the life insurance policies. The district court denied the cross-motions for summary judgment, ruling that there was a calculable basis in the stock, and set the case for trial to determine how the basis should be calculated.

The district court held a two-day bench trial, which featured expert testimony from both sides regarding the basis calculation. The court rejected the Dorrances' argument that the "open transaction" doctrine, espoused by the Court of Federal Claims, applied to their refund request.[4] It also rejected the government's zero basis argument. Instead, the district court ruled that the Dorrances had "paid something for the [membership] rights because they paid premiums for policies that included both policy rights and mutual rights" and that their basis was calculable.

The district court calculated the Dorrances' basis in the stock using the following formula: (1) the initial public offering ("IPO") value of the fixed shares allocated to the Dorrances in 2003, plus (2) 60% of the IPO value of the

---

[4] The district court declined to follow the Court of Federal Claims' approach that "the value of the ownership rights [in mutual rights are] not discernible" and that, therefore, the full basis of the policy should apply under the rarely-used "open transaction" doctrine. *Fisher v. United States*, 82 Fed. Cl. 780, 799 (2008) *aff'd*, 333 F. App'x 572 (Fed. Cir. 2009). In light of our decision, it is unnecessary to address whether the "open transaction" doctrine is applicable to this situation.

variable shares. Applying this formula, the court found that the Dorrances were required to pay taxes on $1,170,678, rather than on the full $2,248,806 value of the stock. Because in 2003 the Dorrances had paid taxes based on a zero basis calculation in the stock, the district court found that they were entitled to a refund.

Both parties appeal the adverse portions of the judgment.

## ANALYSIS

The crux of this case is how to calculate the basis of stock received through demutualization. The question of basis in the stock is a mixed question of law and fact that "require[s] consideration of legal concepts and involve[s] the exercise about the values underlying legal principles [and is] reviewable de novo." *Smith v. Comm'r*, 300 F.3d 1023, 1028 (9th Cir. 2002) (citing *Mayors v. Comm'r*, 785 F.2d 757, 759 (9th Cir. 1986)). The parties do not dispute the district court's factual findings. Instead, their divergence of views stems from the legal conclusions that follow.

As the taxpayers, the Dorrances bear the burden of establishing basis, and "[t]he fact that basis may be difficult to establish does not relieve [them] from [t]his burden." *Coloman v. Comm'r*, 540 F.2d 427, 430 (9th Cir. 1976). Because they failed to establish that they had a basis in the membership rights, we afford the basis utilized by the IRS a presumption of correctness—even where, as here, that figure is zero. *Id.* The Supreme Court explained long ago in a similar context that "[t]he impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in

other cases, as the result of a failure of proof." *Burnet v. Houston*, 283 U.S. 223, 228 (1931).

## A. THE STRUCTURE OF MUTUAL INSURANCE POLICIES

In analyzing the insurance policies, it pays to bear in mind that, "[a]s an overarching principle, absent specific provisions, the tax consequences of any particular transaction must reflect the economic reality." *Washington Mut. Inc.*, 636 F.3d at 1217 (citing *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 766 (Fed. Cl. 1994); *United States v. Winstar Corp.*, 518 U.S. 839, 863 (1996)). The reality here is that the Dorrances acquired the membership rights at no cost, but rather as an incident of the structure of mutual insurance policies.

The logic of this conclusion is simple—when the Dorrances purchased their mutual insurance policies in 1996, the premiums they paid related to their rights under the insurance contracts, not to collateral membership benefits such as voting. Under the insurance contract, policyholders paid premiums for the following "contract rights": (1) a death benefit; (2) the right to surrender the policy for a "cash value"; and (3) annual policyholder dividends representing the policyholder's portion of the company's "divisible surplus."

Separate from the contract rights, through operation of law and the company charter, each policyholder had a right to vote on certain matters, such as the election of the board of directors. That vote was restricted to one vote per policyholder, regardless of the size or face value of the policy. In addition, in the very unlikely event of a liquidation, the policyholder was entitled to any surplus from

that liquidation.[5]  At trial, the government expert stated that he did not know of a single mutual insurance company that had ever had a solvent liquidation, a point echoed by the MetLife representative.  This bundle of rights—derived from operation of law—is referred to as "mutual rights" or "membership rights."[6]  These rights are not transferable and upon termination of a policy, the policyholder receives nothing for any membership rights.

The difference between contract rights and membership rights is critical to resolution of this case.  The premiums paid covered the rights under the insurance contract, not any membership rights.  Notably, the policies themselves generally make no reference to any such membership rights. In other words, premium payments go toward the actual cost of the life insurance benefits provided.  The mutual companies did not count membership rights as having a cost (apart from minimal administrative costs, if there is a policyholder vote), so they did not charge policyholders for such rights.

The government's expert, American Academy of Actuaries member Ralph Sayre, testified that mutual companies calculate premiums based solely on the expected cost of providing contractual insurance benefits.  This calculation process is "very precise in actuarial circles" and

---

[5]  Prior to demutualization, solvent liquidation in a mutual insurance company was unlikely because mutual insurance companies are highly regulated entities that operate conservatively to remain as a "going concern" for their policyholders.

[6]  The moniker "mutual rights" more accurately describes what is at issue, though we adopt the term "membership rights" as used by the parties.

"there just is no portion of the premium or charge for membership rights." He linked this analysis to the obvious: "[U]sually you don't pay [for] something if . . . you aren't charged for it." This explanation is consistent with the Supreme Court's description of what the premium pays for: "It is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder." *Penn Mut. Life Ins. Co. v. Lederer*, 252 U.S. 523, 525 (1920).

In referencing "ownership rights," by which he meant membership rights, the description by the Dorrances' expert was essentially in line with Sayre's conclusion: "The ownership rights were not separate from the policy rights and could not be sold. The cost associated with acquiring ownership rights cannot be established exclusively through premium payments."

Consistent with the general practice for mutual insurances companies, the companies involved in this case did not charge the Dorrances for their membership rights. This point was underscored by Mr. Dorrance's testimony that, at the time he bought the policies, he actually understood that he would pay *less* for a policy from a mutual insurance company than he would for one from a stock company. *See S. Bancorporation, Inc. v. United States*, 732 F.2d 374, 377 (4th Cir. 1984) (rejecting refund claim where the taxpayer "introduced no evidence to prove that it intended to pay an enhanced value for the [asset] *at the time of sale*") (emphasis in original). It was no surprise then, that in 2003, when the Dorrances filed their tax returns following the sale of the stock derived from demutualization, they listed their basis as zero.

## B.  THE EFFECT OF DEMUTUALIZATION

The membership rights were assigned a monetary value at the time of the exchange only as a consequence of the demutualization process.  The error of the Dorrances and the district court was to assume that the value received upon demutualization was linked with some premium value paid by the policyholders in the past.  But the stock the Dorrances received in exchange for the membership rights cannot be understood as a partial return on their past premium payments and it is well understood that policyholders do not contribute capital to the companies.

By the time of the demutualization, the lion's share of the surplus that fed valuation of the newly issued stock could not be traced to payments made by current policyholders.  Nearly all of the surplus held by the companies at that time was attributable to former policyholders, not current policyholders like the Dorrances.    For  example,  at  the  time  of demutualization, less than 10% of the Sun Life surplus was attributable  to  current  policyholders;  premiums  paid  by former policyholders accounted for over 90% of the surplus. Thus, the value at demutualization was not derived from something paid for by the Dorrances.

Sayre explained the situation as follows:

> The demutualization is not a result of [] current policyholders having done something different from the other previous millions of policyholders, but is a result of outside influences, such as tax policy, economic conditions or competitive pressures. The current policyholders are fortunate to be

policyholders at the time of demutualization but their value received is a result of the new stockholders who are willing to pay them in order to receive their membership benefits for the purpose of what they can do with them in the future.

This anomaly prompted one insurance company official involved in this case to refer to the receipt of stock as a "windfall" for current policyholders. This characterization was echoed by the Sixth Circuit, which referred to demutualization proceeds as "a pot of money that no one expected or even envisioned." *Bank of New York v. Janowick*, 470 F.3d 264, 266 (6th Cir. 2006); *see also* Douglas P. Faucette & Timothy S. Farber, *National Insurance Act of 2007 & Demutualization of Insurers: The Devil is in the Details*, 58 Fed'n Def. & Corp. Couns. Q. 109, 127 (2007) (noting that policyholders "receive payouts that they had not expected, consciously bargained for, or purchased. Simply put, distribution of the surplus amounts to 'a windfall resulting from the increase in the value of that policy arising from its unforseen restructuring.'" (citation omitted)).

Following the transfer of stock, it was business as usual in terms of the contract rights. After demutualization, the Dorrances' insurance premiums remained level—reinforcing the fact that they had not been paying a "premium" for any membership rights in the first place. For example, the premium history for Principal Financial Group shows that the Dorrances' premium was $124,450 both before and after the 1999 demutualization. This transition occurred under the oversight of regulators who were charged with ensuring that policyholders were treated fairly during the demutualization

process and who did not require a reduction in the premiums to sync with the loss of the now-claimed rights. The Dorrances continued to pay the same premiums and receive the same coverage. The stock exchange, for which they paid nothing, was the only aspect of the transaction related to membership rights.

The demutualizations themselves were structured as tax-free, meaning that the initial transaction by which the Dorrances received the stock did not trigger any taxable gain for the policyholders. As an exchange under I.R.C. § 354[7], the deal would not have been tax free if there was a gain upon the exchange. I.R.C. § 358(a)(1) (providing that the basis of property received under a § 354 exchange "shall be the same as that of the property exchanged"). In other words, the stock was a direct exchange for the lost membership rights.

Put another way, the basis in the new stock was the same as the basis in what was being exchanged—the membership rights. Hence, the companies told policyholders that the tax basis on the stock was "zero." For example, with regard to the receipt of stock, Phoenix explained in its Q&A document:

> If you receive common stock, you will not be taxed when you receive it. However, if you sell or otherwise dispose of your common stock, you will be taxed on the full amount of

---

[7] I.R.C. § 354(a)(1) provides:

> No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

> the proceeds you receive for the common
> stock. (Your tax basis in the common stock
> will be zero.)

The other companies alerted policyholders to the same thing:
Sun Life advised that the "cost basis of these shares for tax
purposes will be zero" and, after saying that the tax cost
would be "zero," Principal Mutual stated that "if you later
sell or otherwise dispose of your Common Stock, you will
generally be taxed on the full amount of the proceeds of that
sale or other disposition."

The insurance companies' advice to their policyholders
comports with IRS rulings dating back to the 1970s. Those
rulings stated that the policyholder's basis in mutual rights is
zero. *See* Rev. Rul. 71-233, 1971-1 C.B. 113; Rev. Rul. 74-
277, 1974-1 C.B. 88. Revenue Ruling 71-233 addresses the
tax consequences to policyholders when they exchange their
proprietary interests for preferred stock. Consistent with our
explanation above—distinguishing between contract rights
and membership rights (which are also referred to as
proprietary rights), the IRS advised:

> Payment by each policyholder of the
> premiums called for by the insurance
> contracts issued by X represents payment for
> the cost of insurance and an investment in his
> contract but not an investment in the assets of
> X. His proprietary interest in the assets of X
> arises solely by virtue of the fact that he is a
> policyholder of X. Therefore, the basis of

> each policyholder's proprietary interest in X
> is zero.

*Id*.

Within the tax code, the transaction exchanging mutual rights for stock does not operate in a vacuum. Treating the premiums as payment for membership rights would be inconsistent with the Code's provisions related to insurance premiums. For example, gross premiums paid to purchase a policy are allocated as income to the insurance company; no portion is carved out as a capital contribution. *See* I.R.C. §§ 803(a)(1), 118. On the flip side, the policyholder is allowed to deduct the "aggregate amount of premiums" paid upon receipt of a dividend or cash-surrender value. I.R.C. § 72(e). No amount is carved out as an investment in membership rights. The taxpayer can't have it both ways—a tax-free exchange with zero basis and then an increased basis upon sale of the stock.

The district court skipped a critical step by examining the *value* of the mutual rights without evidence of whether the Dorrances paid anything to first acquire them. The basis inquiry is concerned with the latter question. The district court also erred when it estimated basis by using the stock price at the time of demutualization rather than calculating basis at the time the policies were acquired. The stock value post-demutualization is not the same as the cost at purchase.

We have previously explained that basis[8] "refers to a taxpayer's capital stake in an asset for tax purposes." *Washington Mut. Inc.*, 636 F.3d at 1217 (citing *In re Lilly*, 76 F.3d 568, 572 (4th Cir. 1996)). "The taxpayer must prove what, if anything, he actually was required to pay . . . not what he would have been willing to pay or even what the market value . . . was." *Better Beverages, Inc. v. United States*, 619 F.2d 424, 428 (5th Cir. 1980). Here the Dorrances failed to do so.

### CONCLUSION

This analysis brings us back to the Dorrances' burden and the economic realities of this case. Because the Dorrances offer nothing to show payment for their stake in the membership rights, as opposed to premium payments for the underlying insurance coverage, the IRS properly rejected their refund claim. The district court erred when it found after the bench trial that the Dorrances had shown they paid something for the membership rights. It should have found their basis to be zero.

**REVERSED.**

---

[8] The Code provides that "[t]he basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)." I.R.C. § 1012(a). None of these exceptions apply here.

M. SMITH, Circuit Judge, dissenting:

For thousands of years, philosophers, theologians, and now physicists, have debated whether the earth was created *ex nihilo*, i.e., out of nothing. Whatever the answer to that question, there is little doubt that my colleagues in the majority have performed a notable miracle of their own in this case, by creating nothing out of something, i.e., *nihil ex aliquo.* Let us consider how this miracle was wrought by endeavoring to follow the money.

## I.  The Government's Conditions to Demutualization

For what precisely did the Dorrances pay when they purchased policies from the mutual life insurance companies involved in this case? The majority contends that they paid only for a death benefit, the right to surrender the policy for a "cash value," and annual policyholder dividends representing their share of the company's "divisible surplus."

But if, as the majority contends, the Dorrances paid nothing for their membership rights, and did not contribute capital, then why did the several governmental regulators involved require, as a condition of demutualization of each of those insurance companies, that they issue stock to their policyholders to compensate them for the loss of those rights?

Since those who acquired shares in the newly publicly traded insurance companies during the IPO process paid cash for their interests, if the policyholders when the insurance companies were structured as mutual insurance companies had not paid for the surplus they later received in stock, then the value of the distributed shares ought to have remained as the insurance companies' working capital, and not been

gratuitously gifted to policyholders. Neither the regulators nor the IPO investors would have tolerated such a gratuity.

But the stock distribution to the Dorrances, even if not specifically contemplated at the time they purchased the policies, was no gift. While insurance companies may be powerful, they do not have the power of creation *ex nihilo*. To the contrary, by the very nature of a mutual insurance company, all of its accumulated value comes from premiums paid by its owners, and the investment of those premiums. That is why, when allocating shares during the demutualization process, the insurance companies relied on a calculation of a fixed component based on the loss of voting rights and a variable component related to past and projected future contributions to surplus.

The majority relies on a statement by a government's expert: "Some may think that the cash paid out in demutualization comes from the distribution of positive surplus of the mutual company; however, such is not the case. The cash actually comes from new stockholders which subscribe to the IPO . . . ." Here, the Dorrances received stock, not cash. Of course, when they sold the stock, the cash that they obtained from the sale came from the buyers of the stock, and not from the insurance companies' bank accounts. But that is always true in a stock sale. Of course, that does not mean that all stock sales have a zero basis. Thus, the cited government expert's testimony is merely a truism. It provides no support for the majority's conclusion.

## II.  Accrued Surplus or Not?

Some context is in order. The majority mentions the IPO value of the Dorrances' stock: $1,794,771. The majority also

unworthily mentions the Dorrances' net worth, which is not relevant to any issue before us. While the majority concedes that the premiums the Dorrances had paid to the insurance companies, which totaled $15,265,608, were "substantial," the majority is unimpressed by that figure because the face value of the policies was substantially larger than the premium. Of course, that is always the case in insurance. The relevance of the premiums paid to the question before us is that the distributed stock represents only 11.7% of the money the Dorrances had paid the insurance companies. That may not be far from the usual dividends paid on mutual insurance policies.[1]

However, the majority is quick to call that return of a small proportion of funds expended a "windfall." But while the majority asserts that one insurance company official so characterized the stock distribution, he actually took care to state that "windfall" was the company's characterization, not his. Moreover, the majority ignores the fact that every other insurance company representative deposed in this case either expressly rejected that characterization, or in one instance, did not know how to answer the question.

The majority credits testimony by the government's expert that the insurance companies charged the Dorrances premiums that were based solely on the expected costs of

---

[1] The parties did not identify the dividend rates the policies at issue provided. Data for the Massachusetts Mutual Life Insurance Company, not one of the companies at issue, is publicly available. *See* Historical Dividend Studies from Massachusetts Mutual Life Insurance Company (2015), *available at* https://fieldnet.massmutual.com/public/life/pdfs/li7954.pdf (last visited Nov. 18, 2015). That data shows that a policy purchased after March of 1996 yielded a yearly dividend interest rate of between 8.4% and 7.9% between 1996 and 2003.

providing insurance benefits, using calculations that were "very precise in actuarial circles," such that "there is just no portion of the premium or charge for membership rights." That asserted precision is disproved by the existence of a surplus accrued within the insurance company. In fact, the majority elsewhere relies on testimony that, at the time of demutualization, "less than 10% of the SunLife surplus was attributable to current policyholders; premiums paid by former policyholders accounted for over 90% of the surplus."

In other words, despite their asserted actuarial precision, the insurance companies had not been returning via dividend all of the premium surplus. Instead, the surplus accumulated within the companies, where it served the role that any accumulation of capital does. Therefore, the majority errs by stating that "it is well understood that policyholders do not contribute capital to the companies."[2] If not from the policyholders, from whence did that accumulated capital come?

Certainly, the cited testimony raises the question of how much the Dorrances contributed to the surplus. That question

---

[2]  The majority misconstrues government witness Ralph Sayre's testimony in this regard. Sayre testified that, from the view of a mutual insurance company, "because we don't have shareholders who have contributed to surplus or contributed capital to withstand [the demand for benefit payments], we're going to have to charge [the policyholder] a little bit more of that up front. But keep in mind that we will also give it back to you. As our experience unfolds and we realize earnings from that extra charge, or from the use of that extra money, we will return it back to you." Thus, policyholders do contribute capital—but they are eventually supposed to get it back. The majority believes that it comes back with a basis of zero, which complements the majority's belief that the insurance companies created something out of nothing.

was addressed during the demutualization. To determine the number of shares of stock to issue to each member, the insurance companies applied a formula approved by the government regulators, which included a fixed component and a variable component. According to that formula, 14-25% of each company's shares were allocated on a fixed basis to shareholders. The variable shares were allocated based on the "contribution-to-surplus" method, which allocated the total shares based on a policyholder's contribution.

Thus, even if we were to accept the majority's conclusion that the Dorrances had no basis in the voting aspect of the membership rights—remembering that the fixed shares granted solely on that basis were worth $3,164, a minuscule portion of the $1,794,771 of IPO stock at issue—the calculations expressly accounted for their actual contribution to the surplus.

## III. "Tax Free Exchange" Is Not a Synonym for "Zero Basis"

The majority also misapplies the concept of a tax-free exchange in stating that "[t]he taxpayer can't have it both ways—a tax-free exchange with zero basis and then an increased basis upon sale of the stock."

It is unclear how the Dorrances are trying to "have it both ways." All that is required for the exchange to be tax-free is for the value received in stock to be the same as the value of the property exchanged. *See* 26 U.S.C. § 358(a)(1). In this case, the IRS, citing its own interpretations, opined that the basis should be zero. Whether that interpretation squares with the facts is the very question at issue in this case. By relying

in part on the IRS's interpretation to answer the question, the majority assumes the conclusion.

## IV.    The District Court's Sound Calculations

After hearing all of the evidence at trial, the district court determined the Dorrances' cost basis by deducting the expected future premium contribution from the IPO value of the stock, yielding a cost basis of $1,078,128. This was the sum of: (1) the IPO value of the fixed shares allocated to the Dorrances ($3,164) and (2) 60% of the IPO value of the variable shares ($1,074,964). The 60% proportion reflected an expert estimate of past contributions by the Dorrances to the life insurance policies; the remaining 40% was an estimate of the policyholders' future contributions to the policies. Applying this formula, the court found that the Dorrances were required to pay taxes on $1,170,678, which was their sale proceeds of $2,248,806 less their basis of $1,078,128.

Thus, the district court quite sensibly reduced the basis by an expert's estimate of the future contribution component of the IPO value, ensuring that the Dorrances would not underpay the taxes owed. This was a careful analysis using reasonable methodology based on the evidence presented at trial. By contrast, the majority's contrary conclusions do not follow from the facts. A portion of the assets of the insurance companies clearly came from the premiums paid by the Dorrances, and they had a substantial basis in the stock distributed to them. By contending to the contrary, my colleagues in the majority have created nothing out of something. It's a miracle!

I respectfully dissent.