Maple Med., LLP v Scott (2020 NY Slip Op 07366)





Maple Med., LLP v Scott


2020 NY Slip Op 07366


Decided on December 9, 2020


Appellate Division, Second Department


Scheinkman, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 9, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
FRANCESCA E. CONNOLLY, JJ.


2019-09157
 (Index No. 51103/19)

[*1]Maple Medical, LLP, respondent, 
v
Joseph Scott, etc., appellant, et al., defendant.



APPEAL by the defendant Joseph Scott, in an action, inter alia, for a declaratory judgment and to recover damages for unjust enrichment, from an order and judgment (one paper) of the Supreme Court (Lawrence H. Ecker, J.), dated July 5, 2019, and entered in Westchester County. The order and judgment, insofar as appealed from, denied that branch of that defendant's motion which was for summary judgment on his counterclaim for a judgment declaring that he is entitled to receive certain funds in the amount of $128,148, granted that branch of the plaintiff's cross motion which was for summary judgment declaring that it is entitled to receive those funds, declared that the plaintiff is entitled to receive the subject funds, and directed the escrow agent to release the funds to the plaintiff.



Nolan Heller Kauffman, LLP, Albany, NY (Justin A. Heller and Brendan J. Carosi of counsel), for appellant.
Finger & Finger, White Plains, NY (Carl L. Finger of counsel), for respondent.



SCHEINKMAN, P.J.


OPINION & ORDER
In 2018, the defendant Medical Liability Mutual Insurance Company (hereinafter MLMIC) was converted from a mutual insurance company to a stock insurance company. The question presented on this appeal is whether the cash consideration paid as part of the conversion belongs to a physician who was a policyholder of a medical malpractice insurance policy issued by MLMIC or to the medical practice that employed the physician and paid the premiums on the policy. The Departments of the Appellate Division have divided on this question. We agree with our colleagues in the Third and Fourth Departments that the funds belong to the physician-policyholder and respectfully do not agree with our colleagues in the First Department that the funds should be paid over to the medical practice-employer.
RELEVANT FACTS
Prior to the conversion which precipitated this dispute, MLMIC was a mutual insurance company. Pursuant to Insurance Law § 1211(a), mutual insurance companies are organized, maintained, and operated for the benefit of their members and "[e]very policyholder [in a mutual insurance company] shall be a member of such corporation." As members, policyholders "receive both membership interests (e.g., the right to elect directors and the right to receive a proportionate share of the company if it liquidates) and contract rights (i.e., the obligations of the insurance company under the policy)" (Bank of New York v Janowick, 470 F3d 264, 267 [6th Cir]).
The defendant Joseph Scott was a physician employed by the plaintiff, Maple Medical, LLP (hereinafter Maple Medical), a medical practice in White Plains, pursuant to the provisions of an employment agreement dated February 29, 2012. In exchange for Scott's services, [*2]Maple Medical agreed to pay him a base salary and additional compensation and also agreed to pay certain expenses and fringe benefits on his behalf. Among these expenses and fringe benefits were payment of medical insurance premiums for Scott and his family, and Scott's medical license and registration fees, his continuing professional education expenses, his cellular telephone and pager costs, and the premiums on an occurrence type professional liability insurance policy with specified coverage minimums.
Maple Medical also employed five other physicians, Lisa H. Youkeles, Diana Arevalo, Diana Goldenberg, Nina Sundaram, and Mario Mutic. The employment agreements for these physicians also required Maple Medical to pay the premiums for their professional liability insurance policies.
Scott and the other five physicians each obtained medical malpractice insurance policies from MLMIC. Under these policies, each of the physicians was the sole insured and the sole policyholder. Scott, as well as Arevalo, Goldenberg, and Sundaram, executed a form designating Maple Medical as "Policy Administrator," making Maple Medical the "agent" "for the paying of Premium, requesting changes in the policy, including cancellation thereof, and for receiving dividends and any return Premiums when due." Youkeles and Mutic did not designate Maple Medical as Policy Administrator for their policies.
In 2015, the Berkshire Hathaway Group (hereinafter Berkshire Hathaway) approached MLMIC about a possible acquisition of MLMIC by the Medical Protective Company (hereinafter MPC), an affiliate of Berkshire Hathaway. MLMIC's executive committee chose not to pursue that acquisition, but Berkshire Hathaway revised its expression of interest to propose National Indemnity Company (hereinafter NICO) as the purchaser instead of MPC, among other concessions. MLMIC's executive committee voted to pursue the revised expression of interest, and subsequently, its board of directors also voted to pursue the revised expression of interest "as being in the best long-term interest of MLMIC's Policyholders."
On July 15, 2016, MLMIC announced the proposed transaction publicly, and on July 16, 2016, it applied to the Superintendent of the New York Department of Financial Services (hereinafter DFS) for permission to convert MLMIC to a stock insurance company. In its initial email announcement of the proposed conversion and subsequent newsletter, MLMIC stated that, "[o]nce the transaction is finalized, each owner of an eligible policy will be entitled to receive in cash a proportionate share of all of the cash consideration paid by [NICO]. In most cases, the person or entity that paid the premium will be considered as the owner of the eligible policy."
Insurance Law § 7307 governs the conversion process from a mutual insurance company into a stock insurance company. The statute requires the insurer to apply to the Superintendent of DFS, pursuant to a corporate resolution, for permission to convert (see Insurance Law § 7307[b]). Once such permission is obtained, the parties to the proposed transaction must prepare a plan of conversion for approval by the Superintendent (see Insurance Law § 7307[d], [e]). The conversion plan must provide for the exchange of the equitable share of each eligible mutual policyholder for securities or other consideration provided by the stock corporation into which the mutual insurer is to be converted. The statute states that "each person who had a policy of insurance in effect at any time during the three year period" immediately preceding the adoption of the resolution "shall be entitled to receive" the consideration (Insurance Law § 7307[e][3]). The equitable share of each policyholder in the mutual insurer is determined by the ratio which the net premiums (gross premiums less return premiums and dividends paid) properly and timely paid by the policyholder over the three-year period bear to the total net premiums received by the mutual insurer from all eligible policyholders (see id.).
In conformity with the statute, the plan of conversion for MLMIC provided that, as a result of MLMIC's demutualization, "the Eligible Policyholders, or their Designees, will receive Cash Consideration in consideration for the extinguishment of their Policyholder Membership Interests." The Policyholder Information Statement defined "Eligible Policyholder" as the holder of "[a]ny Policy that was In Effect at any time from July 15, 2013 . . . through the Record Date (July 14, 2016)." It defined "designees" as "Policy Administrators . . . to the extent designated by Eligible Policyholders to receive the portion of the Cash Consideration allocated to such Eligible Policyholders." Scott, as well as the other five physicians, declined Maple Medical's requests to be designated to receive the cash consideration.
DFS held a public hearing on the proposed plan of conversion on August 23, 2018. Richard B. Frimer, Maple Medical's managing partner, attended the hearing and expressed [*3]opposition to the concept of distributing the payout to employees who never directly contributed any funds toward their premiums. Frimer argued that many third parties, such as medical groups and hospitals, paid medical malpractice premiums attributable to employees and it was illogical to refund premiums to individual policyholders who themselves had not paid the premiums. According to Frimer, "the equities lie with the payments upon demutualization going to the party or parties that pay the premium." In response to questions from the Superintendent of DFS, Frimer acknowledged that Maple Medical had paid the premiums for employees who had not designated Maple Medical as policy administrator. Frimer expounded that Maple Medical would receive a renewal bill and pay it promptly regardless of whether the form indicated that Maple Medical was the policy administrator. Frimer conceded that the policyholders are the individual physicians. He also stated that dividends paid by MLMIC would be used to reduce the amount of the premiums.
On September 6, 2018, DFS issued a decision approving the demutualization and plan of conversion (Matter of Medical Liab. Mut. Ins. Co. [National Indem. Co.], https://www.dfs.ny.gov/system/files/documents/2019/01/mlmic_decision_20180906.pdf [NY St Dept of Fin Servs, Sept. 6, 2018, Vullo, Supt.] [hereinafter DFS Op]). In its decision, DFS noted that there was a dispute as to whether the cash consideration should be paid to policyholders or to the medical groups and hospitals who paid premiums on behalf of policyholders. DFS stated that section 7307(e) of the Insurance Law refers to "policyholder," who might or might not be the person who paid the premium (DFS Op at 23). DFS also observed that section 7307(e) recognizes the possibility that policyholders may have assigned their legal rights to others. Rather than deny or delay demutualization because of this dispute, the plan set forth an objection procedure for the resolution of disputes related to which party is entitled to the cash consideration. Under this procedure, the cash consideration attributable to each claim in dispute would be held in escrow until the claim is resolved by agreement or by a nonappealable order of an arbitration panel or court with proper jurisdiction. DFS determined that this objection procedure was a "reasonable framework" for resolving disputes between policyholders and entities claiming to be policy administrators (DFS Op at 23) .
Maple Medical challenged the DFS decision by commencing a hybrid proceeding pursuant to CPLR article 78 and declaratory judgment action. On December 28, 2018, the Supreme Court dismissed the petition, determining that it was moot because the demutualization had occurred and more than $2.3 billion in cash payments had been distributed to policyholders pursuant to the DFS decision and the conversion plan (see Maple Medical LLP v New York State Dept. of Fin. Servs.,. Sup Ct, Westchester County, Dec. 28, 2018, Schwartz, J., index No.65929/2018). The court further determined that, in any event, the DFS decision had a rational basis and was not arbitrary and capricious (see id.).
PROCEDURAL HISTORY
In January 2019, Maple Medical commenced six separate actions in the Supreme Court, Westchester County, seeking to establish its entitlement to recover the payments due under the conversion plan on account of the MLMIC policies held by Scott and the other five physicians. The parties then entered into stipulations that "MLMIC shall hold the funds in escrow pending a further stipulation of the parties or a final non-appealable order or judgment of the Court."
In its complaints, Maple Medical asserted causes of action against each physician and MLMIC for judgments declaring that it was entitled to the cash consideration, to recover damages for breach of contract, to direct MLMIC to release the applicable funds from escrow to Maple Medical in accordance with Insurance Law § 7307, and for unjust enrichment. Each physician separately answered the complaint and asserted counterclaims for judgments declaring that they were the parties entitled to the cash consideration.
In the cases involving Scott, Goldenberg, and Sundaram, those defendants separately moved for summary judgment on their respective counterclaims and for summary judgment dismissing the respective complaints insofar as asserted against each of them. In those cases, Maple Medical opposed the separate motions of those defendants and cross-moved for summary judgment on the respective complaints. In the cases involving Youkeles, Arevalo, and Mutic, Maple Medical moved for summary judgment on the complaints asserted against each of those defendants. In those cases, the defendants opposed Maple Medical's motions and separately cross-moved for summary judgment on their respective counterclaims and for summary judgment dismissing the respective complaints insofar as asserted against each of them.
In the present case, involving Scott, the Supreme Court (Lawrence H. Ecker, J.) [*4]addressed "the same single legal issue" at "the heart of all of the actions"—"whether the physician employee or the employer partnership is entitled to a distribution payment made by" MLMIC (Maple Med. LLP v Scott, 64 Misc 3d 909, 910 [Sup Ct, Westchester County]). At the time the court decided the matter, there was only one appellate decision on point—that of the Appellate Division, First Department, in Matter of Schaffer, Schonholz & Drossman, LLP v Title (171 AD3d 465 [hereinafter Schaffer]). Schaffer held that the employer practice group was entitled to the payout based upon a theory of unjust enrichment (see Matter of Schaffer, Schonholz & Drossman, LLP v Title, 171 AD3d at 465; Maple Med. LLP v Scott, 64 Misc 3d at 912).
In this case, the Supreme Court held that it was bound by stare decisis to apply the precedent established by Schaffer in the absence of a contrary ruling from this Court or the Court of Appeals (see Maple Med. LLP v Scott, 64 Misc 3d at 912). Since Schaffer involved identical facts and an identical legal issue, the court applied Schaffer, finding that, in any event, "the conclusions drawn in the First Department's decision [were] persuasive" (Maple Med. LLP v Scott, 64 Misc 3d at 912). Consequently, the court denied Scott's motion, granted Maple Medical's cross motion, declared that Maple Medical was "entitled to the receipt from the escrow agent currently holding [the] funds due it . . . plus accrued interest," and directed the escrow agent to pay the funds within fifteen days of service of the order with notice of entry upon the escrow agent (id. at 913).
In the other five cases, the Supreme Court relying on its rationale in Scott, declared that Maple Medical, not the defendant physicians, was entitled to the cash contribution and directed that the escrow agent release the funds to Maple Medical (Maple Med. LLP v Youkeles, 64 Misc 3d 1213[A], 2019 NY Slip Op 51131[U] [Sup Ct, Westchester County]; Maple Med. LLP v Arevalo, 64 Misc 3d 1213[A], 2019 NY Slip Op 51127[U] [Sup Ct, Westchester County]; Maple Med. LLP v Goldenberg, 64 Misc 3d 1213[A], 2019 NY Slip Op 51128[U] [Sup Ct, Westchester County]; Maple Med. LLP v Sundaram, 64 Misc 3d 1213[A], 2019 NY Slip Op 51130[U] [Sup Ct, Westchester County]; Maple Med. LLP v Mutic, 64 Misc 3d 1213[A], 2019 NY Slip Op 51129[U] [Sup Ct, Westchester County].
Scott appeals and the other defendants each separately appeal. While the six appeals have been prosecuted on separate records and separate briefs, the appeals were argued together. This opinion addresses the issues tendered for our consideration and the other appeals are resolved by separate orders issued in reliance upon the views expressed herein.
LEGAL ANALYSIS
I. Stare Decisis
In their respective briefs, Maple Medical and Scott debate whether the Supreme Court appropriately concluded that it was bound to follow the First Department's decision in Schaffer. Scott, in particular, contends that the Supreme Court was not bound by Schaffer because Schaffer's holding conflicts with prior decisions of this Court and the Court of Appeals and was erroneously decided. Scott also contends that Schaffer was not binding because of its distinct procedural posture and because the physician in that case did not raise the specific arguments raised by Scott here.
In Schaffer, the parties submitted facts to the First Department pursuant to CPLR 3222(b)(3), requesting a declaratory judgment as to whether the employer practice group or employee physician was entitled to the cash consideration and an order to facilitate transfer of the cash consideration to the prevailing party (see Matter of Schaffer, Schonholz & Drossman, LLP v Title, 171 AD3d at 465). Scott points out that in Schaffer, the MLMIC policy was issued to the employer, and the employee physician had only been added onto the employer's policy. Scott also contends that, while the physician in Schaffer argued that the plan of conversion made clear that she was entitled to the cash consideration because she was the policyholder and did not designate the group to receive the funds, she did not raise arguments under Insurance Law § 7307, as Scott does here.
While the parties' contentions about stare decisis have largely been overtaken by subsequent developments, we think it important to correct the misperception inherent in Scott's argument.
The Appellate Division is a single state-wide court divided into departments for administrative convenience (see Mountain View Coach Lines v Storms, 102 AD2d 663, 664). While the Supreme Court is bound to apply the law as promulgated by the Appellate Division in its own department, where the issue has not been addressed within that department, the Supreme Court is obligated to follow the precedent set by the Appellate Division of another department until its home department or the Court of Appeals pronounces a contrary rule (see Phelps v Phelps, 128 AD3d [*5]1545, 1547; D'Alessandro v Carro, 123 AD3d 1, 6; Mountain View Coach Lines v Storms, 102 AD2d at 664). In applying an Appellate Division precedent, it is not open to the Supreme Court to consider whether the precedent was correctly established—that is a matter that may be considered by another department or by the Court of Appeals. Thus, regardless of whether the Supreme Court agreed with the analysis provided by the First Department in reaching its conclusion in Schaffer, the Supreme Court was bound to apply it, in the absence of a contrary precedent from another department or from the Court of Appeals. It is only where two departments have issued conflicting rulings on a point of law that a trial court, situated in neither and whose department has not spoken, may follow the holding that it deems to comport most closely with the law (see Siegel & Connors, NY Prac § 449 at 860 [6th ed], citing Darko v New York City Tr. Auth., 13 Misc 3d 203, 206 [Sup Ct, Bronx County]). Thus, putting aside the happenstance that the Supreme Court here expressed its agreement with the views announced by the First Department in Schaffer, the Supreme Court appropriately concluded that it was bound to follow what was then the only extant binding appellate precedent [FN1]. The niceties of the procedural distinctions between the cases and the precise arguments raised do not give the Supreme Court a basis for disregarding an on-point ruling of a department of the Appellate Division.
These considerations, however, do not apply to this Court. While we should accept the decisions of the other departments as persuasive, we are free to reach a contrary result (see State of New York Mtge. Agency v Braun, 182 AD3d 63, 75; Weaver v State of New York, 91 AD3d 758, 761; Mountain View Coach Lines v Storms, 102 AD2d at 665). With respect to the issue presently before us, after the Supreme Court rendered its determination, the Third and Fourth Departments addressed the same exact issue and each has reached a result contrary to that of the First Department.
In Maple-Gate Anesthesiologists, P.C. v Nasrin (182 AD3d 984 [hereinafter Maple-Gate Anesthesiologists, P.C.]), the Appellate Division, Fourth Department, in a memorandum decision, held that, pursuant to Insurance Law § 7307(e)(3), the defendant employees were entitled to the MLMIC demutualization payments as the policyholders of the MLMIC professional liability policy, notwithstanding that the plaintiff medical group had paid the insurance premiums. The Fourth Department stated that, although the defendant employees had assigned some of their rights as policyholders to their employer, they had not designated the employer to receive the demutualization payments. The Fourth Department further stated that "[t]he mere fact that [the employer] paid the annual premiums on the policies on [the employees'] behalf does not entitle it to the demutualization payments (cf. Matter of Schaffer, Schonholz & Drossman, LLP v Title, 171 AD3d 465, 465)" (Maple-Gate Anesthesiologists, P.C. v Nasrin, 182 AD3d at 986). The "cf." citation to Schaffer reflects the Fourth Department's awareness of that decision as well as its disagreement with it.
Shortly thereafter, in Schoch v Lake Champlain OB-GYN, P.C. (184 AD3d 338, lv granted 35 NY3d 918 [hereinafter Schoch]), the Third Department, in an opinion by Justice Robert C. Mulvey, held that the plaintiff, a certified nurse midwife and obstetrics/gynecology nurse practitioner, was entitled to the cash consideration from the MLMIC conversion, even though her employer, the defendant medical group, had paid the premiums on the professional liability policy as required by an employment agreement. Contemporaneously, the Third Department applied its Schoch ruling to reverse the denial of summary judgment to the plaintiff employee in Shoback v Broome Obstetrics & Gynecology, P.C. (184 AD3d 1000 [hereinafter Shoback])[FN2]. In Shoback, while the Supreme Court in the order on appeal had stated its inclination to agree that the plaintiff [*6]employee there was entitled to the cash consideration, that court, like the Supreme Court in this case, found that it was constrained to follow Schaffer (see Shoback v Broome Obstetrics & Gynecology, P.C., 184 AD3d 1000). In Shoback, the Third Department, like us, concurred that the Supreme Court was bound by Schaffer; however, the Third Department expressed its disagreement with Schaffer and declined to follow it (see Shoback v Broome Obstetrics & Gynecology, P.C., 184 AD3d 1000).
Given the division of opinion among the departments of the Appellate Division, we must decide, subject to ultimate determination by the Court of Appeals,[FN3] what the appropriate rule of law ought to be for this Department, giving due weight to the views expressed by our colleagues in the other departments. Of necessity here, our view will align with at least one department and will depart from that of at least one department.
II. The Policyholder is Entitled to the Proceeds of the MLMIC Demutualization
The plain language of Insurance Law § 7307, the plan of conversion, and the DFS decision make clear that the policyholder is entitled to the consideration paid in connection with the MLMIC demutualization.
Until 2018, MLMIC was a mutual insurance company. It was then converted into a stock insurance company. The conversion was governed by the detailed provisions of the Insurance Law. Section 7307(e)(3) of that statute provides that, when a mutual insurance company demutualizes, the plan of conversion shall include "[t]he manner and basis of exchanging the equitable share of each eligible mutual policyholder for securities or other consideration, or both, of the stock corporation into which the mutual insurer is to be converted and the disposition of any unclaimed shares" (emphasis added). The statute specifically requires that the plan of conversion
"provide that each person who had a policy of insurance in effect at any time during the three year period immediately preceding the date of adoption of the resolution . . . shall be entitled to receive in exchange for such equitable share, without additional payment, consideration payable in voting common shares of the insurer or other consideration, or both"
(id. [emphasis added]). As the Third Department explained in Schoch (184 AD3d at 342), that portion of the statute "explains who is entitled to receive the consideration," which is "anyone who had a policy of insurance in effect during the relevant time period." The statute is precise and it is clear and unambiguous.
In conformity with the statute, the MLMIC plan of conversion also makes clear that the policyholders are the ones entitled to the cash consideration unless there has been a specific designation to an identified policy administrator. The preamble to the plan of conversion states that "the Eligible Policyholders, or their Designees, will receive Cash Consideration in consideration for the extinguishment of their Policyholder Membership Interests" (emphasis added). Ensuing articles of the plan consistently reflect that the payments belong to the policyholders in the absence of an express designation to a policy administrator.
Article 1 of the plan of conversion states that the "amounts allocated to Eligible Policyholders shall vary according to the premiums properly and timely paid under their Eligible Policies, and shall be payable to Eligible Policyholders, or their Designees, as described in Article 8 of this Plan of Conversion, in respect of the extinguishment of all Policyholder Membership Interests" (emphasis added). "Eligible Policyholder" is defined in the MLMIC Policyholder Information Statement as the "[t]he Policyholder of an Eligible Policy," which is defined as "[a]ny Policy that was In Effect at any time from July 15, 2013 . . . through the Record Date (July 14, 2016)." The definition of Eligible Policyholder states that "each such Eligible Policyholder shall be entitled to an allocation of the Cash Consideration." "Designee" is defined as "Policy Administrators . . . to the extent designated by Eligible Policyholders to receive the portion of the Cash Consideration allocated to such Eligible Policyholders."
Article 6, Section 6.3(f) of the plan of conversion states: "The amount distributable to each Eligible Policyholder shall be paid directly to such Eligible Policyholder unless such Eligible Policyholder has affirmatively designated a Policy Administrator or EPLIP Employer to receive such [*7]amount on its behalf, in which case such amount shall be distributed to such Designee" emphasis added). Article 8, Section 8.2(a), titled, "Allocation of Cash Consideration for the Eligible Policyholders," states, "Each Eligible Policyholder (or its Designee) shall receive a cash payment in an amount equal to the applicable Conversion Payment" (emphasis added).
The MLMIC Policyholder Information Statement and the Notice to Policyholders also made clear that the policyholder was entitled to the cash consideration unless he or she affirmatively designated, in writing, a policy administrator to receive the funds. The Policyholder Information Statement contained the following Question and Answer:
"Q5. Who is eligible to receive consideration in connection with the Proposed Transaction?
"A5. Each Policyholder of an Eligible Policy will be eligible to receive a share of the Cash Consideration. Owners of such Policies are referred to as Eligible Policyholders in this policyholder information statement. The amount distributable to Eligible Policyholders shall be paid directly to each Eligible Policyholder unless such Eligible Policyholder has affirmatively designated in writing (using a designation form to be provided by MLMIC) a Policy Administrator or EPLIP Employer to receive such amount on its behalf . . ." (emphasis added).
Similarly, MLMIC's notice for policyholders of its planned conversion to a stock insurance company stated: "In connection with the Conversion, it has been determined that the current policy administrator designations on file with MLMIC do not extend to the distribution of the cash amounts allocated to eligible policyholders . . . In order for cash amounts to be distributed to policy administrators, eligible policyholders must appoint their policy administrators to receive such distributions" (emphasis added).
In its decision approving the plan of conversion, DFS considered "a written comment asserting that the group of policyholders eligible to be paid shares of the purchase price should be changed or that the purchase price should be allocated differently" (DFS Op at 22 [internal quotation marks omitted]). DFS, however, rejected the argument, opining that "Insurance Law § 7307(e)(3) explicitly defines those policyholders who are eligible to receive the purchase price consideration based on the three-year period of eligible policies" (id. at 23 [internal quotation marks omitted]).
DFS also did not accept the contention, which had been advanced by Maple Medical, that the person that paid the premium is thereby entitled to the proceeds of the sale. "The Superintendent finds that this is not determinative because [Insurance Law § 7307(e)(3)] refers to the 'policyholder,' which might or might not be the person who paid the premiums" (id. at 23 [internal quotation marks omitted]). However, DFS, when discussing the dispute resolution process, noted that the Insurance Law "also recognize[d] that such policyholders may have assigned such legal right to other persons. Therefore, the Plan appropriately includes an objection and escrow procedure for the resolution of disputes for those persons who dispute whether the policyholder is entitled to payment in a given case" (id. [internal quotation marks omitted]).
In Schoch and in Maple-Gate Anesthesiologists, P.C., the Third and Fourth Departments, respectively, considering the language of the Insurance Law, the plan of conversion, and the DFS decision, determined that the employee physicians, not the employer practice groups, were entitled to the cash consideration (see Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 343-344; Maple-Gate Anesthesiologists, P.C. v Nasrin, 182 AD3d at 985). Both courts were unpersuaded by the argument that the employee physician's designation of his or her employer as policy administrator entitled the policy administrator to the cash consideration. In Schoch, the Third Department held that the practice group's "designation as policy administrator gave it no greater right to the cash consideration, and plaintiff did not explicitly assign that right to defendant and declined to do so" (Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 342). "Although the conversion plan gives a policy administrator the right to object if it believes that it has a legal right to the cash consideration, the right to object carries no rights, in and of itself, to the consideration, and the objector must prove its claimed legal right thereto," which the employer practice group failed to do in that case (id.). Similarly, the Fourth Department in Maple-Gate Anesthesiologists, P.C., opined that the plan of conversion stated the cash contribution would be made to the policyholder unless he or she affirmatively designated a policy administrator to receive it on his or her behalf (see Maple-Gate Anesthesiologists, P.C. v Nasrin, 182 AD3d at 985). In that case, the physician [*8]employees "were the policyholders of the relevant MLMIC policies and . . ., although [the physician employees] had assigned some of their rights as policyholders to plaintiff [employer] as Policy Administrator, they had not designated plaintiff to receive demutualization payments" (id.).
Here, it is undisputed that Scott (as well as the other physicians) did not specifically designate Maple Medical to receive the demutualization payments and that, in the cases of Youkeles and Mutic, Maple Medical was never designated policy administrator at all.
Maple Medical argues that there is a provision of Insurance Law § 7307 by which its payment of the premiums entitled it to the cash consideration. Maple Medical points to the portion of the statute which states:
"The equitable share of the policyholder in the mutual insurer shall be determined by the ratio which the net premiums (gross premiums less return premiums and dividend paid) such policyholder has properly and timely paid to the insurer on insurance policies in effect during the three years immediately preceding the adoption of the resolution by the board of directors under subsection (b) hereof bears to the total net premiums received by the mutual insurer from such eligible policyholders"
(Insurance Law § 7307[e][3] [emphasis added])
DFS considered, and rejected, this precise argument in its decision, finding that the matter of who paid the premium "is not determinative because [Insurance Law § 7307(e)(3)] refers to the 'policyholder,' which might or might not be the person who paid the premiums" (DFS Op at 23 [internal quotation marks omitted]). This argument was also found unavailing by the Third Department in Schoch.
The Third Department reasoned that "[t]he first quoted sentence of this statute [Insurance Law § 7307] explains who is entitled to receive the consideration, whereas the second quoted sentence explains how the consideration for each eligible person is to be calculated" (Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 342). Thus, it determined that the language "such policyholder has properly and timely paid to the insurer" "pertains to how the considerations are calculated, rather than to whom they must be paid. The reference to 'policyholder' immediately preceding the word 'paid'—the latter of which is the word that [the employer] focuses on—supports our interpretation" (id. at 342-343 [internal quotation marks omitted], citing Columbia Mem. Hosp. v Hinds, 65 Misc 3d 1205[A], 2019 NY Slip Op 51508[U], *4 [Sup Ct, Columbia County], affd ___ AD3d ___, 2020 NY Slip Op 06329). Further, the Third Department noted that
"DFS's decision, in addressing similar comments raised by a different medical employer, concluded that an employer is not entitled to the consideration merely based on its payment of the premiums on an insurance policy, because the same provision refers to 'policyholder,' which may or may not be the person who paid the premium"
(Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 343, citing Maple-Gate Anesthesiologists, P.C. v Nasrin, 63 Misc 3d 703, 709 [Sup Ct, Erie County], affd 182 AD3d 984 ["The formula takes into account the amount of premiums paid. No distinction is made between a policyholder who pays the premium out of his (or her) own pocket versus a policyholder whose employer pays the premium as part of an employee compensation package. Insurance Law § 7307 does not confer an ownership interest . . . to anyone other than the policyholder"]).
As the Third Department held,
"DFS explained in its decision that Insurance Law § 7307 defines the policyholders eligible to receive cash considerations but recognizes that they may have assigned such legal rights to others; that is why MLMIC's conversion plan includes a procedure for objections and holding considerations in escrow pending resolution of any disputes"
(Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 343).
"According to DFS, the determination of who is entitled to the cash in these situations depends on the facts and circumstances of the parties' relationship and the applicable law. [The employer] attempts to take [the] last portion of DFS's decision [*9][regarding the objection procedure] out of context, as if all determinations of the proper payee are based on the parties' relationship. However, that only applies if an objector raises a legitimate assertion that it is entitled to the consideration based on an assignment from the policyholder, which does not exist here. Accordingly, pursuant to the language of the statute, the conversion plan and DFS's decision, MLMIC should pay the cash consideration to [the employee physician]"
(id. at 343-344 [citation omitted]).
Here, like in Schoch and Maple-Gate Anesthesiologists, P.C., there is no dispute that, while some of the physicians employed by Maple Medical assigned to their employer some rights as policy administrator, none of the physicians designated Maple Medical to receive the cash consideration. We agree with the Third and Fourth Departments that Insurance Law § 7307 makes clear that the policyholder is entitled to the consideration, and that the references to the amount of premiums paid applies only to calculation of the amount of consideration. Thus, the defendants are "legally entitled to receive the cash consideration" (Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 344). Accordingly, in accordance with the controlling statute, the plan of conversion, and the DFS decision, Scott, and the other Maple Medical physicians, are entitled to the cash consideration (see id. at 342-344; Maple-Gate Anesthesiologists, P.C. v Nasrin, 182 AD3d at 985-986).
In reaching this conclusion, we also note that the First Department in Schaffer did not express any contrary views as to the import of the statute, the conversion plan, and the DFS approval decision. Rather, the First Department's determination to award the cash consideration to the employer medical group was predicated entirely upon the theory of unjust enrichment, a theory to which we now turn (see Matter of Schaffer, Schonholz & Drossman, LLP v Title, 171 AD3d at 465).
III. Unjust Enrichment
Maple Medical argues that Scott, as well as the other physicians, will be unjustly enriched if they receive the cash consideration because it was Maple Medical who paid all of the premiums under the policies. In response, Scott and the others contend that, under their employment agreements with the plaintiff, they agreed to devote their professional services to Maple Medical in exchange for which Maple Medical agreed to provide them with compensation and various benefits, including payment of their malpractice insurance. Scott and the other physicians assert that, in exchange for the benefits Maple Medical paid to and for them, Maple Medical received the services from them that it bargained for and cannot predicate an unjust enrichment claim upon the premiums paid in consideration for the services provided.
To establish a cause of action for unjust enrichment, "[a] plaintiff must show 'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered'" (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182, quoting Citibank, N.A. v Walker, 12 AD3d 480, 481 [internal quotation marks omitted]; see GFRE, Inc. v U.S. Bank, N.A., 130 AD3d 569, 570). "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421).
"Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent"
(id.). "'The essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another'" (Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 344, quoting Clifford R. Gray, Inc. v LeChase Constr. Servs., LLC, 31 AD3d 983, 988).
In Schaffer, the First Department held that although the physician employee
"was named as the insured on the relevant MLMIC professional liability insurance policy, [the employer practice group] purchased the policy and paid all the premiums on it. [The employee] does not deny that she did not pay any of the annual premiums or any of the other costs related to the policy. Nor did she bargain for the benefit of the demutualization proceeds. Awarding [the employee] the cash proceeds of MLMIC's demutualization would result in her unjust enrichment"
(Matter of Schaffer, Schonholz & Drossman, LLP v Title, 171 AD3d at 465). Significantly, as the defendants argue, as the Third Department noted in Schoch, and as we have observed above, the First Department did not discuss the Insurance Law, the plan of conversion, or the DFS decision in its memorandum decision.
In setting forth its conclusion that awarding the physician the proceeds of the demutualization would result in unjust enrichment, the First Department cited two federal court cases: Ruocco v Bateman, Eichler, Hill, Richards, Inc. (903 F2d 1232, 1238 [9th Cir 1990] [hereinafter Ruocco]) and Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund (2005 WL 525427, *4, *8, 2005 US Dist LEXIS 42877, *10-11, *21-22 [ND Ill, Mar. 4, 2005, No. 02 C 3115] [hereinafter Chicago Truck Drivers]).
In Ruocco, the defendant, a stock brokerage and financial consulting firm, offered its employees group long term disability insurance through Union Mutual Insurance Company (see Ruocco v Bateman, Eichler, Hill, Richards, Inc., 903 F2d at 1234). The Union Mutual policy was paid for by the employees participating in the plan and the defendant deducted premiums from their pay (see id.). In 1986, Union Mutual notified the defendant that it intended to convert from a mutual insurance company to a wholly-owned subsidiary of a publicly-owned stock corporation called UNUM (see id. at 1235). Under Maine law, where Union Mutual was incorporated, the conversion could take place only upon distribution to each policyholder of a pro rata share of the retained surplus which the converting company had acquired while it was operating as a mutual insurance company (see id.). Union Mutual notified the defendant that the returned surplus would take the form of shares of UNUM stock and warrants to purchase additional shares of UNUM stock (see id.). The defendant decided to exercise the warrants and paid the sum of $609,336 to buy 25,755 shares of UNUM stock, which were sold by the defendant for a profit of $104,913.30 (see id.). The defendant also received a distribution of UNUM shares in 1988, which it sold for $524,510.01, making the total profit it received from the sale of shares $629,423.31 (see id.).
The plaintiff commenced an action in the United States District Court for the Central District of California (hereinafter the California District Court) claiming that the defendant's decision to retain the UNUM distribution violated the Employee Retirement Income and Security Act of 1974 (29 USC § 1001 et seq. [hereinafter ERISA]), California Commercial Code section 8315 (since repealed), and the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1961 et seq. [hereinafter RICO]) (see Ruocco v Bateman, Eichler, Hill, Richards, Inc., 903 F2d at 1235). The California District Court granted summary judgment to the plaintiff on the ERISA and California Commercial Code claims, finding that the plan was an "employee welfare benefit plan" as defined by ERISA, that defendants were "fiduciaries" of the plan, that the plaintiff was a "participant" in the plan, and that the surplus dividend was an "asset of the plan" (id. [internal quotation marks omitted]). The California District Court found that "the balance of equities" weighed in favor of the plan participants because they paid for the plan and the funds would not benefit them if distributed to the defendants (id.). The United States Court of Appeals for the Ninth Circuit affirmed on the "balance of equities" issues, stating, "[w]e agree with the [California] district court that the balance of equities weighs in favor of the plaintiff class" (id. at 1238).
In Chicago Truck Drivers, the plaintiff sought a declaratory judgment against the defendant pension fund and the defendant labor union to the effect that the demutualization compensation paid for four employee-benefit plans of Principal Financial Group (hereinafter Principal) was a plan asset and should revert to the participants of the plans (see Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund, 2005 WL 525427, *1, 2005 US Dist LEXIS 42877, *1-2). Principal adopted its plan for demutualization in 2001 (see Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund, 2005 WL 525427, *1, 2005 US Dist LEXIS 42877, *2). In Chicago Truck Drivers, the issues before the United States District Court for the Northern District of Illinois (hereinafter the Illinois District Court) were whether the demutualization compensation was an asset of the employee benefit plans, and, if so, whether the compensation reverted to the participants of the plan or to the employers (see Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund, 2005 WL [*10]525427, *1, 2005 US Dist LEXIS 42877, *3). The Illinois District Court determined that, under ERISA and guidance from the Department of Labor advisory opinions, because the contributions to a 401(k) plan were made entirely by the employees, outside of minor administrative costs, the demutualization compensation attributable to the 401(k) plan should revert to the employees (see Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund, 2005 WL 525427, *3-4, 2005 US Dist LEXIS 42877, *11, *22). However, as to the other three employee-benefit plans, the Illinois District Court found that the demutualization compensation attributable to a severance plan must be used to offset future employer contributions and that the demutualization compensation attributable to an in-house pension plan and a life insurance plan reverted to the employers (see Chicago Truck Drivers, Helpers & Warehouse Workers Union [Ind.] Health & Welfare Fund v Local 710, Intl. Bhd. of Teamsters, Chicago Truck Drivers, Helper & Warehouse Workers Union [Ind.] Pension Fund, 2005 WL 525427, *8, 2005 US Dist LEXIS 42877, *19, *21-23).
We do not agree with our colleagues in the First Department that the principles found in Ruocco and Chicago Truck Drivers should apply here. Those cases involved employee benefit plans subject to ERISA and, as a result, ERISA and federal law principles governed. In contrast, Maple Medical has presented a cause of action against Scott, as well as against its other physician employees, founded on unjust enrichment, a cause of action grounded in state law principles. The essence of Maple Medical's unjust enrichment claim is an effort to use the principles of unjust enrichment to overcome the medical professionals' entitlement to the proceeds of demutualization, which entitlement derives from this State's Insurance Law. We therefore conclude that the unjust enrichment claim must be analyzed under New York's common law principles of unjust enrichment. The federal ERISA authorities are of no assistance in this regard.
We note, as the Third Department did in Schoch, that recovery in unjust enrichment is not available where the parties have a contract which governs the subject matter (see Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 345, citing Pappas v Tzolis, 20 NY3d 228, 234). While the parties here had an employment agreement, their contract does not provide for who would be entitled to demutualization proceeds, an absence which is hardly surprising since, until the MLMIC conversion, there had never been a demutualization of a professional liability insurance company in this state (see Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 345).
As we have already observed, the essential inquiry for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. In undertaking this inquiry, we must look to see if a benefit has been conferred upon the defendant under mistake of fact or law, if the benefit remains with the defendant, if there has been a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent (see Paramount Film Distrib. Corp. v State of New York, 30 NY2d at 421; see also Mandarin Trading Ltd. v Wildenstein, 16 NY3d at 182). To prevail, the proponent of the cause of action must establish that it conferred a benefit on the other party and that the other party will retain that benefit without adequately compensating the first party therefor (see Beaman v Awaye Realty Mgt., LLC, 176 AD3d 1025; MT Prop., Inc. v Ira Weinstein & Larry Weinstein, LLC, 50 AD3d 751, 752).
Applying these principles here, Maple Medical has not proven, and cannot prove, a cause of action for unjust enrichment. It has not provided the benefits in question to its employee-physicians—those benefits are provided by the plan of conversion and, ultimately, by the acquiring entity. At most, Maple Medical provided malpractice insurance premium payments, surely a benefit, but a benefit of the employment contracts between Maple Medical and its physician-employees for which the physician-employees paid valuable consideration in the form of their labor. Since the physicians provided their services to Maple Medical in exchange for the benefits paid to them, or for them, under the employment agreements, it simply cannot be said that the employees have not already adequately compensated Maple Medical for the benefits paid. The payment of the medical malpractice insurance premiums was not a gratuitous act; it was part of the bargained-for consideration for the employment services that the physicians provided to the medical group. Moreover, the medical group itself benefitted from the payment of premiums for the malpractice policies to the extent that they covered the group's vicarious liability for the acts of its employees.
Analyzed somewhat differently, we agree with our colleagues in the Third Department that it cannot be said that any benefit was paid here under a mistake of law or fact. The [*11]demutualization proceeds are properly payable to the policyholders (or their written designees) based upon the appropriate construction of the governing statute and the conversion plan. No mistake of fact exists. No party changed its position. There was no fraud or other tortious conduct.
The thrust of Maple Medical's argument is that Scott and the other physicians are receiving a windfall as the result of the demutualization of MLMIC. However, as our colleagues in the Third Department have written, the reality is that the consideration would equally be a windfall to Maple Medical if it were to receive it. Neither party bargained for it and neither party can be said to have paid for it. Membership interests in a mutual insurance company are not paid for by the premiums; rather, such rights are acquired, at no cost, as an incident of the structure of the mutual insurance policy, through operation of law and the company's charter and bylaws (see Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 345-346, citing Dorrance v United States, 809 F3d 479, 485). We find the Third Department's analysis very persuasive:
"Had [the medical group] selected a different company to provide malpractice insurance to cover [the employee], [the medical group] would have met its contractual obligation to provide and pay for that insurance while [the employee] would have received the benefit of such coverage. Under those circumstances, neither party would receive a cash consideration. Thus, the demutualization proceeds were unexpected and will be a windfall to whichever party receives them. The fact that one party will receive these benefits does not mean that such party has unjustly enriched itself at the other's expense (see Goel v Ramachandran, 111 AD3d [783,] 791), i.e., that it 'is in possession of money or property that rightly belongs to another' (Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC, 31 AD3d at 988)"
(Schoch v Lake Champlain OB-GYN, P.C., 184 AD3d at 346).
The Fourth Department reached a similar conclusion in Maple-Gate Anesthesiologists, P.C., where it held that "[t]he mere fact that [the employer practice group] paid the annual premiums on the policies on [the employees'] behalf does not entitle it to the demutualization payments" (Maple-Gate Anesthesiologists, P.C. v Nasrin, 182 AD3d at 986).
We therefore conclude that Maple Medical has no cognizable unjust enrichment cause of action against Scott or any of the other physicians.
IV. The Escrow Provision
Finally, Scott and the other physicians argue that the Supreme Court's orders directing the escrow agent to release the funds to Maple Medical violated the escrow procedure set forth in the plan of conversion and the terms of the parties' stipulation. We agree. The plan of conversion states, "[i]f MLMIC receives a properly filed objection, the allocated Cash Consideration will be held in escrow by the Conversion Agent until MLMIC receives joint written instructions . . . as to how the allocation is to be distributed, or a non-appealable order of an arbitration panel or court with proper jurisdiction ordering payment of the allocation" (emphasis added). The stipulations the plaintiff entered into with Scott, and each of the other physicians, likewise provided that "MLMIC shall hold the funds in escrow pending a further stipulation of the parties or a final non-appealable order or judgment of the Court." Here, the court's orders underlying the instant and related appeals (see Maple Medical LLP v Youkeles, __ AD3d ___ [decided herewith]; Maple Medical LLP v Arevalo, __ AD3d ___ [decided herewith]; Maple Medical LLP v Goldenberg, __ AD3d ___ [decided herewith]; Maple Medical LLP v Sundaram, __ AD3d ___ [decided herewith]; Maple Medical LLP v Mutic, __ AD3d ___ [decided herewith]) were appealable and, accordingly, the funds should have been held in escrow pending the outcome of these appeals.
V. Conclusion
Accordingly, the order and judgment is reversed insofar as appealed from, that branch of the motion of the defendant Joseph Scott which was for summary judgment on his counterclaim for a judgment declaring that he is entitled to receive certain funds in the amount of $128,148 is granted, and that branch of the plaintiff's cross motion which was for a judgment declaring that it is entitled to receive those funds is denied. Since this is an action for, inter alia, a declaratory judgment, the matter is remitted to the Supreme Court, Westchester County, for the entry of a judgment, among other things, declaring that the defendant Joseph Scott is entitled to receive the [*12]subject funds in the principal amount of $128,148 and directing that such funds be released to the defendant 30 days after service of this opinion and order with notice of entry, provided that in the event Maple Medical timely moves for leave to appeal to the Court of Appeals, the funds shall remain in escrow pending a determination of such motion and, if such motion is granted, pending a determination of that appeal.
DILLON, DUFFY and CONNOLLY, JJ., concur.
ORDERED that the order and judgment is reversed insofar as appealed from, on the law, with costs, that branch of the motion of the defendant Joseph Scott which was for summary judgment on his counterclaim for a judgment declaring that he is entitled to receive certain funds in the amount of $128,148 is granted, that branch of the plaintiff's cross motion which was for a judgment declaring that it is entitled to receive those funds is denied, and the matter is remitted to the Supreme Court, Westchester County, for the entry of a judgment, inter alia, declaring that the defendant Joseph Scott is entitled to receive the subject funds in the principal amount of $128,148 and directing the release of the funds to that defendant 30 days after service of this opinion and order with notice of entry, provided that in the event the plaintiff timely moves for leave to appeal to the Court of Appeals, the funds shall remain in escrow pending a determination of such motion and, if such motion is granted, pending a determination of that appeal.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:We note that the Supreme Court, in another case decided subsequently, determined to follow the position of the First Department, rather than the view of the Third and Fourth Departments (see Healthcare Radiology & Diagnostic Sys., PLLC v Goldman, ___ Misc 3d ___, 2020 NY Slip Op 20306 [Sup Ct, Westchester County]). The First Department's view was also followed, and the view of the Third and Fourth Department not, in Wyckoff Heights Med. Ctr. v Monroe (2020 NY Slip Op 32580[U] [Sup Ct, Kings County]).

Footnote 2:The Third Department also applied Schoch in Columbia Mem. Hosp. v Hinds (___ AD3d ___, 2020 NY Slip Op 06329 [3d Dept]).

Footnote 3:Such a determination may be forthcoming as the Court has granted leave to appeal in Schoch.